# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| VALUE DRUG COMPANY, on behalf of itself and all others similarly situated,<br><br>              *Plaintiff*,<br><br>v.<br><br>ALKERMES, INC., and ALKERMES PHARMA IRELAND LIMITED,<br><br>              *Defendants*. | Civil Action No. _____<br><br><br>Jury Trial Demanded |

# CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

I.      INTRODUCTION ..........................................................................................................1

II.     PARTIES ....................................................................................................................4

III.    JURISDICTION AND VENUE ..................................................................................5

IV.     REGULATORY BACKGROUND & RELEVANT MARKET DYNAMICS..................6

        A.      Brand Manufacturer NDAs And The Orange Book. ................................................6

        B.      Generic Manufacturer ANDAs And The Hatch-Waxman Amendments. ..............7

        C.      Paragraph IV Certifications Enable NDA Holders To File Suit And
                Thereby Trigger An Automatic Stay Of The FDA's Ability To Approve
                The ANDA Generic For Up To 30 Months. ..........................................................9

        D.      Patent Applicant's Duty to Disclose Material Prior Art to the Patent
                Office. ..................................................................................................................10

        E.      Issued Patents Are Not Absolute. ..........................................................................11

        F.      The *Inter Partes* Review System. ........................................................................11

        G.      The Economics of Bioequivalent, AB-Rated Generic Drugs. ..............................13

V.      FACTS ......................................................................................................................14

        A.      In 2006, The FDA Approved Vivitrol. ..................................................................14

        B.      In 2011, Alkermes Obtained U.S. Patent No. 7,919,499 Through Fraud
                And Then Wrongfully Listed That Fraudulently-Obtained Patent In The
                FDA's Orange Book For Vivitrol. ........................................................................15

                1.      Alkermes and Dr. Ehrich intentionally withheld material prior art
                        that would have rendered the claims of the '499 patent invalid. ..............17

                2.      Alkermes and Dr. Ehrich intentionally withheld material prior art
                        that would have refuted or shown inconsistencies with Dr. Ehrich's
                        2009 Declaration. ....................................................................................20

                3.      The intentional concealment of the 2000 Prior Art Study and the
                        false statements in Dr. Ehrich's 2009 Declaration fraudulently
                        induced the Patent Office to issue the '499 patent....................................22

                4.      Alkermes and Dr. Ehrich acted with intent to deceive the Patent
                        Office. ....................................................................................................23

5.    Alkermes wrongfully listed its fraudulently-obtained '499 patent in the Orange Book. ...................................................................................24

C.    In 2018, Generic Manufacturer Amneal Instituted *Inter Partes* Review Proceedings That, But For Alkermes' Inducements To Settle, Would Have Resulted In The Invalidation Of The Relevant Claims Of The '499 Patent In 2019 And Paved The Way For Generic Competition To Start As Early As 2020. ............................................................................................24

D.    In 2020, Generic Manufacturer Teva Filed The First Vivitrol ANDA Prompting Alkermes To File Sham Hatch-Waxman Litigation And Thereby Trigger The Automatic 30-Month Stay Of FDA Approval..................28

E.    In 2023, Alkermes Induced Teva To Settle With An Agreement To Delay Its Generic Launch Until 2027..............................................................30

F.    Absent Alkermes' Monopolization Scheme, Generic Vivitrol Would Have Launched As Early As May 26, 2020, The Day After The Last Of All The Other 18 Vivitrol Patents Expired........................................................31

VI.    CLASS ALLEGATIONS ...........................................................................35

VII.    MARKET POWER AND DEFINITION ..........................................................38

VIII.    MARKET EFFECTS AND CLASS DAMAGES ...............................................41

IX.    ANTITRUST IMPACT ..............................................................................42

X.    CLAIM ACCRUAL AND/OR STATUTE OF LIMITATIONS TOLLING .................43

XI.    CLAIM FOR RELIEF ...............................................................................44

COUNT I: 15 U.S.C. § 2 SCHEME TO MONOPOLIZE .................................44

XII.    DEMAND FOR RELIEF............................................................................47

XIII.    JURY DEMAND ....................................................................................48

Plaintiff Value Drug Company ("Value Drug" or "Plaintiff"), on behalf of itself and all others similarly situated, brings this Class Action Complaint against defendants Alkermes, Inc. and Alkermes Pharma Ireland Limited (together "Alkermes"), and alleges as follows based on: (a) personal knowledge, (b) the investigation of its counsel, and (c) information and belief.

## I.    INTRODUCTION

1.    This action for violation of section 2 of the Sherman Act, 15 U.S.C. § 2, arises from an overarching anticompetitive scheme by Alkermes to unlawfully prolong its monopoly in the injectable naltrexone market and protect its brand Vivitrol monopoly profits from AB-rated generic competition.

2.    Vivitrol, the brand name for injectable naltrexone, is an anti-opioid intramuscular injection indicated to treat alcohol dependence and to prevent relapse into opioid dependence manufactured and sold by Alkermes that, during the relevant period, had over $400 million in annual U.S. sales.

3.    Alkermes' entire brand Vivitrol franchise is currently protected by only a single patent, U.S. Patent No. 7,919,499.  This '499 patent issued in 2011 and has a 2029 expiry date. Alkermes had 18 other patents it claimed protected Vivitrol, but, by 2020, all 18 of those other patents had expired.

4.    As discussed below, Alkermes obtained the '499 patent by fraud and took various additional anticompetitive actions thereafter to unlawfully exclude generic competition and preserve its brand Vivitrol monopoly revenues.  But for Alkermes' fraudulently obtaining the '499 patent and the other anticompetitive actions alleged herein, less expensive generic injectable naltrexone would have been available in the United States on or about May 26, 2020, the day after the expiration date for the last of all the other 18 Vivitrol patents.

5.    This action seeks damages, measured as overcharges, on behalf of the Plaintiff

and a proposed class of purchasers that bought Vivitrol directly from Alkermes on or after May 25, 2020, up through the present, and up to the day the anticompetitive effects of Alkermes' monopolization scheme have ceased (the "Class").

6.      Alkermes' unlawful scheme to monopolize included at least the following elements, none of which represents competition on the merits:

    a.  Alkermes' fraudulently obtaining the '499 patent by, among other things, intentionally withholding material prior art with intent to deceive the United States Patent and Trademark Office (the "Patent Office"), falsely representing to the Patent Examiner with intent to deceive that "unexpected results" justified the patent's issuance when those results were not unexpected as demonstrated by the 2000 Prior Art Study that Alkermes disclosed to members of the public in 2000, but later intentionally withheld from the Patent Office; because the patentee fraudulently induced the Patent Office to issue the '499 patent, which would not have otherwise issued, these misrepresentations and withholdings constitute fraud under *Walker Process*[1];

    b.  Alkermes' wrongful listing of the '499 patent in the Food and Drug Administration's ("FDA") Orange Book as covering Vivitrol, when, in fact, the '499 patent was invalid and/or unenforceable *ab initio* because, as Alkermes knew, the '499 patent had been obtained by fraud and/or was otherwise invalid as obvious or anticipated by prior art;

    c.  Alkermes' inducing generic drug manufacturer Amneal Pharmaceuticals LLC

---

[1] *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172 (1965).

("Amneal") to drop its *inter partes* review challenge (IPR2018-00943) that otherwise would have invalidated all of the at-issue claims of the '499 patent in 2019 and paved the way for generic competition to Vivitrol to commence at any time after the last of all the other Orange Book-listed Vivitrol patents expired in May 2020;

d. Alkermes' reliance on its wrongful listing of the '499 patent in the Orange Book to initiate Hatch-Waxman patent infringement litigation in 2020 against would-be generic Vivitrol drug maker, Teva Pharmaceuticals USA, Inc. ("Teva"), to thereby trigger the Hatch-Waxman automatic 30-month stay of the FDA's approval of Teva's generic;

e. Alkermes' reliance on its fraudulently-obtained '499 patent to prosecute sham Hatch-Waxman patent infringement litigation against Teva, which, even in the absence of the fraud that rendered the '499 patent invalid *ab initio*, was independently anticompetitive, baseless sham litigation because the '499 patent was invalid and/or unenforceable as obvious or anticipated by prior art; and

f. Alkermes' inducing Teva to drop its challenge to the '499 patent with an agreed-to 2027 generic entry date to thereby prevent the invalidation of the '499 patent in 2023 and permit Alkermes to again, later wield the '499 patent against other would-be generics seeking to compete with Vivitrol before 2027.

7.    Alkermes' anticompetitive scheme had and continues to have its intended anticompetitive consequence:  it has delayed and continues to delay generic competition to Vivitrol.  That unlawful delay has artificially preserved Alkermes' monopoly in the injectable naltrexone market, enabling Alkermes to charge and continue to charge supracompetitive brand

prices on Vivitrol. But for Alkermes' monopolization scheme, less-expensive generic injectable naltrexone would have been available by May 26, 2020, for Plaintiff and other Class members to instead purchase. For every day of delay, Alkermes' anticompetitive conduct has caused Plaintiff and other Class members damages in the form of overcharges, measured by the difference in brand Vivitrol versus generic injectable naltrexone prices. Over the relevant period, Alkermes' monopolization scheme has forced (and continues to force) Plaintiff and other Class members to pay several hundreds of millions of dollars in overcharges that Plaintiff and the Class would not have otherwise paid.

## II.    PARTIES

8.    Plaintiff Value Drug Company is a corporation organized under the laws of the State of Pennsylvania and is located at 195 Theater Drive, Duncansville, Pennsylvania. During the Class Period, Value Drug purchased brand Vivitrol directly from Alkermes when it would have purchased a less-expansive Vivitrol generic had it been available, and therefore suffered antitrust injury as a result of the scheme to monopolize alleged herein.

9.    Defendant Alkermes, Inc. is a Pennsylvania company with its principal place of business in Waltham, Massachusetts, and it is the Vivitrol NDA holder.

10.    Defendant Alkermes Pharma Ireland Limited is an entity incorporated in Ireland and based in Dublin, and the title holder for U.S. Patent No. 7,919,499, which is listed in the FDA's Orange Book for Vivitrol.

11.    Alkermes, Inc. and/or Alkermes Pharma Ireland Limited (together "Alkermes"), either directly or through one or more of their agents, developed and manufactures Vivitrol, which Alkermes markets, distributes, and sells throughout the United States.

12.    Together, Alkermes, Inc. and Alkermes Pharma Ireland Limited jointly filed a Hatch-Waxman suit against would-be generic Vivitrol manufacturer Teva Pharmaceuticals USA,

4

Inc. in the United States District Court for the District of New Jersey (C.A. No. 20-cv-12470), alleging that Teva's ANDA for Vivitrol infringed the '499 patent.

13.     All of the actions described in this complaint are part of, and in furtherance of, the unlawful conduct alleged herein and were authorized, ordered, or undertaken by Alkermes officers, agents, employees, or other representatives while actively engaged in the management of Alkermes' affairs and within the course and scope of their duties and employment or with Alkermes' actual, apparent, or ostensible authority.

### III.    JURISDICTION AND VENUE

14.     The Court has subject matter jurisdiction over this matter under 28 U.S.C. §§ 1331, 1337(a) and 15 U.S.C. § 15.

15.     This action arises under section 2 of the Sherman Act (15 U.S.C. § 2), violations of which are made privately actionable through section 4 of the Clayton Act (15 U.S.C. §15(a)), and seeks threefold damages, costs of suit, and reasonable attorneys' fees for the overcharges paid by Plaintiff and members of the proposed class resulting from Alkermes' overarching scheme to monopolize the injectable naltrexone market.  The Court therefore has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337(a), and 15 U.S.C. § 15.

16.     Alkermes transacts business within this District and carries out interstate trade and commerce in substantial part in this District and/or has an agent and/or can be found in this District.  Venue is therefore appropriate within this District under section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. §1391(b) and (c).

17.     The Court has personal jurisdiction over Alkermes.  Alkermes has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme throughout the United States, including in this District. The scheme has been

directed at, and has had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

### IV.    REGULATORY BACKGROUND & RELEVANT MARKET DYNAMICS

#### A.    Brand Manufacturer NDAs And The Orange Book.

18.    Under the Food, Drug, and Cosmetics Act ("FDCA"), drug companies looking to sell a new drug product in the United States must file a New Drug Application ("NDA") with the FDA. An NDA submission must include specific data concerning the safety and effectiveness of the drug.

19.    Under the Drug Price Competition and Patent Term Restoration Act of 1984 (the "Hatch-Waxman Amendments"), Pub. Law No. 98- 417, 98 Stat. 1585 (1984), an NDA applicant must submit to the FDA information on each patent that claims "the drug" or "a method of using such drug" described in the NDA and for which "a claim of patent infringement could reasonably be asserted if a person not licensed by the owner . . . engaged in the manufacture, use, or sale of the drug." 21 U.S.C. § 355(b)(1), (c)(2). The FDA then publishes this information in a digest titled *Approved Drug Products with Therapeutic Equivalence Evaluations*, commonly known as the Orange Book.

20.    The Hatch-Waxman Amendments further provide that if a drug patent is issued after NDA approval, the NDA sponsor must file that new patent listing information for inclusion in the Orange Book no later than 30 days after the date the patent is issued. 21 U.S.C. § 355(c)(2).

21.    The FDA does not police the listing of patents or other material in the Orange Book. The FDA performs only a ministerial act in listing in the Orange Book the patents a brand manufacturer submits. Thus, the FDA relies completely on the manufacturer's truthfulness about its Orange Book listing information.

22.     Once a brand manufacturer lists a patent in the Orange Book, that listing puts potential generic competitors on notice that the brand considers the patent to cover its drug substance or method of use (*i.e.*, usage as indicated for the treatment of a certain disease or condition).

23.     The listing of a patent in the Orange Book triggers various regulatory consequences.  Among these consequences:  a would-be generic drug manufacturer is obligated to respond to each such Orange Book-listed patent in one of a limited number of ways, discussed further below.

**B.     Generic Manufacturer ANDAs And The Hatch-Waxman Amendments.**

24.     Congress passed the Hatch-Waxman Amendments to balance the need to provide brand companies with incentives to develop new medicines against the countervailing need to speed the entry of less expensive generic versions of these medications.

25.     The Hatch-Waxman Amendments enable a generic manufacturer to file an Abbreviated New Drug Application ("ANDA") with the FDA for a drug it seeks to bring to market as a less expensive substitute for its corresponding brand. Rather than requiring generic manufacturers to conduct expensive clinical trials to re-prove the drug's safety and efficacy, the Hatch-Waxman Amendments allow generic manufacturers to rely on the data the brands have already submitted to prove the drug's safety and efficacy. Instead, a generic manufacturer must show that its generic formulation is pharmaceutically equivalent and bioequivalent to the brand. The premise – codified by Congress and implemented by the FDA for the past forty years – is that two drug products that contain the same active pharmaceutical ingredient ("API") in the same dose that are absorbed by the human body in the same way are equally safe and effective.

26.     In practical terms, this means that an ANDA applicant must show that the generic drug product described in the ANDA is substantially "the same as" the brand drug[2]; that is, that the generic product contains the same API, route of administration, dosage form, strength, rate and extent of absorption (bioequivalence), at least one of the same conditions of use, and, with certain permissible differences, substantially the same labeling as the brand reference listed drug ("RLD").[3]  Having done so, the ANDA applicant may rely on the FDA's previous finding that the brand drug product is safe and effective because—as a matter of science and decades of experience—there is no reason to believe that the generic product would behave any differently in the body. If a generic application meets those criteria relative to its brand counterpart, the FDA assigns the generic drug an "AB" rating.  An AB-rating means that the FDA has determined that the generic is equally as safe and effective as its RLD and therefore can be freely substituted for the brand.

27.     The Hatch-Waxman Amendments also provide the framework through which a generic manufacturer must address each patent the NDA holder listed in the Orange Book as covering its brand drug. To obtain FDA approval of its ANDA, a generic manufacturer must, with respect to each Orange-Book listed patent, either (i) provide one of the four below-listed certifications, or (ii) agree to carve out from its label the method-of-use claimed in such patent.

---

[2] *See* 21 U.S.C. § 355(j)(2)(A) (2008) (the same active ingredient(s), route of administration, dosage form, strength, rate and extent of absorption (bioequivalence), at least one same condition of use, and similar labeling).

[3] *Id.* § 355(j)(2)(A)(iv); *see also* 21 C.F.R. 314.94(a)(7).

28.    If not addressed with a label carve out, the ANDA must include one of the following four certifications with respect to each patent the brand manufacturer listed in the Orange Book as covering its brand drug (21 U.S.C. § 355(j)(2)(A)(vii)(I)-(IV); 21 C.F.R. § 314.94(a)(12)(i)(A)):

(I)    that such patent information has not been filed (a "Paragraph I certification");

(II)    that such patent has expired (a "Paragraph II certification");

(III)    that the generic applicant does not seek to market its generic version of the reference-listed drug until the date on which such patent will expire (a "Paragraph III certification"); or

(IV)    that the generic applicant seeks to market its generic version of the reference-listed drug before the expiration date of the patent, but that such patent is invalid, unenforceable, or will not be infringed by the manufacture, use, or sale of the generic drug for which the application is submitted (a "Paragraph IV certification").

## C.    Paragraph IV Certifications Enable NDA Holders To File Suit And Thereby Trigger An Automatic Stay Of The FDA's Ability To Approve The ANDA Generic For Up To 30 Months.

29.    If an ANDA applicant wishes to market its generic product for any approved FDA indication prior to the expiration date of a brand's Orange-Book listed patent (that is not subject to a label carve out), the ANDA applicant must file a Paragraph IV certification. The applicant must then provide the NDA holder and the patent owner notice of its Paragraph IV certification. This notice must include a detailed description of the legal and factual bases for the ANDA holder's assertion that the patent is invalid, not infringed by the ANDA product, or is otherwise unenforceable. 21 U.S.C. § 355(j)(2)(B)(iv)(II).

30.    The filing of a Paragraph IV certification then supplies standing for the NDA

holder to initiate patent litigation against the ANDA applicant (if otherwise compliant with Rule

11 of the Federal Rules of Civil Procedure), and, if the NDA holder files a patent infringement

action against the ANDA filer within 45 days of receiving that ANDA applicant's Paragraph IV

notice, that lawsuit will automatically trigger a stay of the FDA's ability to grant final approval

to the ANDA for up to 30 months from the date of receipt of the Paragraph IV notice. 21 U.S.C.

§ 355(j)(5)(B)(iii).

31.     Hence, the listing of even an invalid or unenforceable patent in the Orange Book

affords the NDA holder a powerful tool to delay generic competition for up to 30 months.

**D.      Patent Applicant's Duty to Disclose Material Prior Art to the Patent Office.**

32.     Each individual associated with the filing and prosecution of a patent application

has a duty of candor and good faith in dealing with the Patent Office, which includes a duty to

disclose to the Patent Office all information known to that individual to be material to

patentability. 37 C.F.R. §1.56(a). This includes each inventor named in the application, each

attorney or agent who prepares or prosecutes the application, and every other person who is

substantively involved in the preparation or prosecution of the application and who is associated

with the inventor, the applicant, an assignee, or anyone to whom there is an obligation to assign

the application. 37 C.F.R. §1.56(c).

33.     Information is material to patentability when it is not cumulative to information

already of record or being made of record in the application, and establishes, by itself or in

combination with other information, a prima facie case of unpatentability of a claim; or, it

refutes, or is inconsistent with, a position the applicant takes in opposing an argument of

unpatentability relied on by the Patent Office, or it refutes, or is inconsistent with, a position the

applicant takes in asserting an argument of patentability. 37 C.F.R. §1.56(b).

34.     The regulations further provide that no patent will be granted on an application in

connection with which fraud on the Patent Office was practiced or attempted or the duty of disclosure violated through bad faith or intentional misconduct. 37 C.F.R. §1.56(a).

**E.     Issued Patents Are Not Absolute.**

35.     The existence of one or more patents purporting to cover a drug product does not guarantee a brand drug company a monopoly over the drug. Patents are routinely invalidated or held unenforceable.

36.     As a statistical matter, if the parties litigate a pharmaceutical patent infringement suit to a decision on the merits, it is more likely than not that a challenged patent will be found invalid or not infringed rather than upheld and found infringed. The FTC reported that generics prevailed in 73% of Hatch-Waxman patent litigation cases resolved on the merits between 1992 and 2002, and a similar empirical study of all substantive decisions rendered in every patent case filed in 2008 and 2009 similarly concluded that when a generic challenger stays the course until a decision on the merits, the generic prevails 74% of the time.[4]

**F.     The *Inter Partes* Review System.**

37.     In 2011, Congress passed the Leahy-Smith America Invents Act to address a widely held concern that invalid patents were being issued and enforced to the detriment of both innovation and the economy.

38.     A centerpiece of this legislation is the system of *inter partes* review. Through this system, members of the public can challenge improperly issued patents. The advent of *inter partes* review vastly expanded the universe of patent challengers, ensuring that many patents that

---

[4] John R. Allison, Mark A. Lemley & David L. Schwartz, *Understanding the Realities of Modern Patent Litigation*, 92 TEX. L. REV. 1769, 1787 (2014) ("[P]atentees won only 164 of the 636 definitive merits rulings, or 26%," and "that number is essentially unchanged" from a decade ago.).

should not have been granted are challenged and invalidated. This system also creates a less expensive and more efficient venue for patent validity challenges than challenges in district court. *Inter partes* review proceedings are overseen by technically educated judges, skilled in the sciences of a particular discipline.

39.    An *inter partes* review commences when a party – often a would-be target of a patent infringement suit – petitions the Patent Office's Patent Trial and Appeals Board to reconsider the Patent and Trademark Office's issuance of a patent as improvidently granted, often on the grounds that the patent should have never issued in the first place because its claimed invention was obvious or anticipated by prior art, or otherwise unpatentable.

40.    The Patent Trial and Appeals Board will grant such a request for an *inter partes* review only if the patent challenger shows "a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition." 35 U.S.C. § 314(a).  If a petition is granted and *inter partes* review instituted, a final written decision on the challenged patent is due within one year of the institution date.

41.    *Inter partes* review proceedings have become a very effective method of challenging improperly granted patents: a 2017 analysis concluded that only 4% of all petitions end with a final written decision in which all claims are upheld as patentable; and 69% of all petitions that have reached final written decisions have led to findings that all of the claims in the issued patent were invalid or unpatentable from the start.[5]

---

[5] Steve Brachmann & Gene Quinn, *Are More than 90 Percent of Patents Challenged at the PTAB Defective?*, IP Watch Dog (June 14, 2017), http://www.ipwatchdog.com/2017/06/14/90-percent-patents-challenged-ptab-defective/id=84343/.

**G.      The Economics of Bioequivalent, AB-Rated Generic Drugs.**

42.      Because bioequivalent and pharmaceutically equivalent (*i.e.*, AB-rated) generic versions of brand-name drugs contain the same API and are determined by the FDA to be just as safe and effective as their branded counterparts, the only material differences between generic drugs and their branded counterparts are their prices and manufacturers. Because generic versions of branded products are commodities that cannot be differentiated, the primary basis for generic competition is price.

43.      Typically, generics are at least 25% less expensive than their branded counterparts when there is a single generic competitor. They are 50% to 80% (or more) less expensive when there are multiple generic competitors on the market for a given brand. Generic purchases rapidly replace brand purchases as a result of this price difference.  Consequently, the launch of a bioequivalent generic drug usually results in significant cost savings to all drug purchasers and a precipitous loss in profits to the maker of the brand drug.

44.      Since the passage of the Hatch-Waxman Amendments, every state has adopted substitution laws that either require or permit the substitution of AB-rated generic equivalents for branded prescriptions.

45.      Several factors – the regulatory interchangeability of bioequivalent AB-rated generics for the brand, state substitution laws, margin incentives of pharmacies, managed care preference for generic drugs – result in the typical phenomenon that once a brand drug "goes generic," the product swiftly moves from a monopoly-priced to a commodity-priced item.

46.      Generic competition enables all members of the chain of distribution, including all direct purchasers and patients, to purchase generic versions of the drug at substantially lower prices than the brand.

47.      Until a generic version of the brand drug enters the market, however, there is no

bioequivalent generic drug to substitute for and compete with the brand drug, and therefore the brand manufacturer can continue to charge supracompetitive prices.

48.     Brand manufacturers such as Alkermes are well aware of generics' rapid erosion of their brand sales. Brand manufacturers thus seek to extend their monopolies through any means possible, sometimes resorting to illegal means.

## V.     FACTS

**A.     In 2006, The FDA Approved Vivitrol.**

49.     Following Alkermes' submission of its Vivitrol NDA in March 2005 (NDA No. 21-897), the FDA quickly approved Vivitrol in April 2006 as a "Type 3 - New Dosage Form," indicated to treat alcohol dependence.  In 2010, the FDA granted Alkermes supplemental NDA application (S-015) for an added indication, namely the use of Vivitrol for the prevention of relapse into opioid dependence.  Alkermes listed 18 patents in the Orange Book to protect Vivitrol's exclusivity up through May 25, 2020.

50.     Vivitrol is an intramuscular injection administered by an approved medical provider. With each FDA approval, Alkermes touted Vivitrol as the "first once-a-month medication" for treatment of alcohol or opioid dependence.

51.     Naltrexone, the active ingredient in Vivitrol, is not new.  It has been FDA-approved as a safe and effective treatment for substance abuse since the 1980s.

52.     The use of a synthetic biodegradable polymer delivery system, such as the PLGA delivery mechanism that is incorporated into Vivitrol, also is not new.  It, too, has been known since the 1980s.  PLGA has since become a widely-used, FDA-approved delivery mechanism for a variety of prescription drugs.

**B.    In 2011, Alkermes Obtained U.S. Patent No. 7,919,499 Through Fraud And Then Wrongfully Listed That Fraudulently-Obtained Patent In The FDA's Orange Book For Vivitrol.**

53.    Entitled "Naltrexone Long Acting Formulations and Methods of Use," U.S. Patent No. 7,919,499 ("'499 patent") issued from the Patent Office on April 5, 2011, from U.S. Patent Application No. 11/083,167 ("the '167 Application"), filed on March 17, 2005. The '499 patent claims the benefit of U.S. Provisional Application No. 60/564,542, filed on April 22, 2004.

54.    The '499 patent identifies Alkermes as its sole Assignee.

55.    The '499 patent identifies Dr. Elliot Ehrich as its sole inventor.  Dr. Ehrich was an Alkermes employee at all relevant times, starting in July 2000 through October 2018.

56.    Despite other Alkermes individuals being involved in the alleged invention, the '499 patent does not identify any other inventors. In addition to the other acts detailed above and below, Dr. Ehrich and co-investigators at Alkermes, including at least Chester Osborn, Dave Benziger, Jane Henderson, Timothy Mant, and Raymond Bartus knew that others were involved in the allegedly inventive aspects of the alleged invention of the '499 patent.  But despite the large number of co-authors on the 2000 Prior Art Study, Alkermes limited the number of inventors named on the '499 patent.  Alkermes and Dr. Ehrich did so to conceal the 2000 Prior Art Study and fraudulently obtain the '499 patent.  If Alkermes had identified additional inventors for the '499 patent, those individuals also would have had to submit sworn declarations to the Patent Office, affirming that they would uphold their duty of candor.  Thus, including more inventors on the patent would have made the 2000 Prior Art Study more difficult to conceal (*e.g.*, of those individuals, as discussed below, at least Dr. Bartus attended the December 2000 San Juan conference in person, and presented the 2000 Prior Art Study results personally).

57.    The priority date for the '499 patent is April 22, 2004.  Prior art includes any and

all disclosures of information that occurred or were published before the patent's priority date.

58.    Alkermes[6] and Dr. Ehrich each had a duty to disclose to the Patent Office any material prior art that may have rendered invalid any of the pending claims in the '167 Application.

59.    Alkermes and Dr. Ehrich each also had a duty to disclose any prior art reference that refuted or was inconsistent with the argument(s) presented to the Patent Office either in favor of the patentability or against the unpatentability of any of the pending claims in the '167 Application.

60.    In submitting the '167 Application, Dr. Ehrich attested: "I have reviewed and understand the contents of the above-identified specification, including the claims, as amended by any amendment referred to above." Dr. Ehrich acknowledged the "duty to disclose information which is material to patentability as defined in 37 C.F.R. 1.56." Further, Dr. Ehrich "declare[d] that all statements made herein [in the '167 Application] of my own knowledge are true."

61.    Alkermes and Dr. Ehrich failed to comply with 37 C.F.R. § 1.56 in at least two ways. First, Alkermes and Dr. Ehrich intentionally withheld material prior art that would have established, by itself or in combination with other information, a prima facie case of unpatentability of the claims of the '499 patent. Second, Alkermes and Dr. Ehrich intentionally withheld information that would have refuted, or would have shown inconsistencies with,

---

[6] As used in Section V.B. of the Complaint, the term "Alkermes" includes each of the individuals involved in the procurement or enforcement of the patent for Alkermes, including one or more of Elliot Ehrich, Chester Osborn, Dave Benziger, Jane Henderson, Timothy Mant, Raymond Bartus, Carolyn S. Elmore, and Darlene A. Vanstone, and any other Alkermes individual or agent who owed a duty of candor to the Patent Office under 37 CFR § 1.56 for their involvement in the preparation and/or prosecution of the '167 Application.

Alkermes' and Dr. Ehrich's position in opposing an argument of unpatentability relied on by the Patent Office, and in asserting an argument of patentability.

      **1.    Alkermes and Dr. Ehrich intentionally withheld material prior art that would have rendered the claims of the '499 patent invalid.**

      62.    In 2000, after joining Alkermes, Dr. Ehrich co-authored the study that showed serum AUC of injectable naltrexone at about three times greater than that achieved by 50 mg/day oral naltrexone ("the 2000 Prior Art Study"). Alkermes and Dr. Ehrich, acting with intent to deceive, intentionally did not disclose the 2000 Prior Art Study to the Patent Office.

      63.    Dr. Ehrich co-authored the 2000 Prior Art Study, and he and/or other co-investigators at Alkermes presented the abstract of the 2000 Prior Art Study in December 2000 at the conference of the American College of Neuropsychopharmacology in San Juan, Puerto Rico. The abstract of the 2000 Prior Art Study was turned into a poster that was displayed to attendees of the December 2000 San Juan conference. Dr. Bartus (who was another Alkermes employee, co-author of the 2000 Prior Art Study and a colleague of Dr. Ehrich's), presented the results of the 2000 Prior Art Study in person at the December 2000 San Juan conference, including the dosing and AUC values.

      64.    Alkermes and Dr. Ehrich knew that the abstract of the 2000 Prior Art Study had been submitted to the American College of Neuropsychopharmacology for publication at the December 2000 San Juan conference, as well as in the conference's related written publication, as is the practice for the American College of Neuropsychopharmacology. Alkermes and Dr. Ehrich also knew that the abstract of the 2000 Prior Art Study had been accepted by the American College of Neuropsychopharmacology for publication at the December 2000 San Juan conference and in its related written conference publication.

      65.    Alkermes and Dr. Ehrich also knew that the abstract of the 2000 Prior Art Study

had been turned into a poster for presentation to the conferees at the December 2000 San Juan

conference. Alkermes and Dr. Ehrich also knew that Dr. Bartus had presented in person the

results of the 2000 Prior Art Study, including its dosing and AUC values, during the December

2000 San Juan conference. Despite knowing about each of these public disseminations of the

2000 Prior Art Study, Alkermes and Dr. Ehrich intentionally did not disclose the 2000 Prior Art

Study to the Patent Office. The term "2000 Prior Art Study" is hereafter intended to include all

of these public disseminations.

66.     The intentionally withheld 2000 Prior Art Study was material prior art. For

example, claim 1 of the '499 patent provides "[a] method for treating an individual in need of

naltrexone comprising the step of parenterally administering a long acting formulation

comprising about 310 mg to about 480 mg of naltrexone and a biocompatible polymer to the

individual wherein the serum AUC of naltrexone is about three times greater than that achieved

by 50 mg/day oral administration and wherein the biocompatible polymer is a polylactide-co-

glycolide polymer."

67.     The 2000 Prior Art Study administered, *inter alia*, 300 mg and 600 mg intra-

muscular dosages of naltrexone to a group of individuals. It disclosed a 28-day AUC value of

$84\pm12$ ng*d/mL for the 300-mg injectable dosage and $189\pm27$ ng*d/mL for the 600-mg

injectable dosage. A person of ordinary skill in the art would have understood that this would

lead to a 28-day AUC value between 100 and 150 ng*d/mL for a 380-mg injectable dosage, or a

daily AUC value between 3.571 ng*d/mL and 5.357 ng*d/mL (and Dr. Ehrich agreed to as

much, under oath). It was known in the art that the AUC value of 50-mg oral naltrexone was, for

example, 27.8 $\mu$g h/L or 1.158 ng*d/mL. Dr. Ehrich's own 2009 Declaration acknowledged an

AUC value of 50-mg oral naltrexone of 1.278 ng*d/mL. Therefore, a person of ordinary skill in

the art, including Dr. Ehrich, would have understood that the ratio of the AUC in the 2000 Prior Art Study's 380-mg injectable dosage (*i.e.*, between 3.571 and 5.357 ng*d/mL) to be at least 3 times the AUC value of the oral 50-mg dosage (*i.e.*, 1.158 or 1.278 ng*d/mL). In other words, the 2000 Prior Art Study would have been understood by a person of ordinary skill in the art to have disclosed the same dosing and AUC values claimed in the '499 patent.

68.     In addition, the 2000 Prior Art Study disclosed a sustained release formulation of naltrexone encapsulated into a biodegradable, polyactide-co-glycolide polymer. This is the same biocompatible polymer claimed in the '499 patent.

69.     Furthermore, the 2000 Prior Art Study discloses a 300 mg naltrexone formulation, which a person of ordinary skill in the art would understand to be about 310 mg.

70.     Alternatively, a person of ordinary skill in the art would have known how to increase the 2000 Prior Art Study's dosage by 10 mg or more. For example, in *Comer*, the authors used a 384 mg dosage by administering two separate subcutaneous injections of 192 mg. A person of ordinary skill in the art could have administered three injections of 150 mg dosage, totaling 450 mg naltrexone.

71.     The 2000 Prior Art Study was repeatedly publicized, including at least being publicly available in Puerto Rico, being published again in writing thereafter, and being cited in other academic papers.  The December 2000 San Juan conference itself was jointly sponsored by the Vanderbilt University Medical Center Division of Continuing Medical Education and the American College of Neuropsychopharmacology.  In addition to its presentation at that conference, the 2000 Prior Art Study was also published in a related written conference publication by the American College of Neuropsychopharmacology; that publication was publicly available in libraries within months of that December 2000 conference (which is typical

19

for American College of Neuropsychopharmacology conferences and related publications).

72.     The 2000 Prior Art Study is also cited in B. Johnson, A Pilot Evaluation of the Safety and Tolerability of Repeat Dose Administration of Long-Acting Injectable Naltrexone (Vivitrex®) in Patients with Alcohol Dependence, Alcohol Clin. Exp. Res., Vol. 28, No. 9, 1356, at 1361 (2004).  This article alone includes 8 co-authors, including Dr. Ehrich himself, who would have necessarily had access to the 2000 Prior Art Study.  Any claim that Alkermes' disclosures in Puerto Rico were subject to "confidentiality" measures is therefore irreconcilable with at least: (1) the follow-up written publication, which was publicly available in prominent libraries, consistent with the mission and typical publication practices of the American College of Neuropsychopharmacology; (2) Dr. Ehrich's co-authors' ability to review, evaluate, and cite the contents of the 2000 Prior Art Study's disclosures for publication in other, peer-reviewed medical publications; (3) the conference's role as part of "Continuing Medical Education" co-sponsored by a prominent American medical school; and (4) Dr. Ehrich's own treatment of the 2000 Prior Art Study's disclosures. Moreover, these factors show that Dr. Ehrich was fully aware of the disclosure of the 2000 Prior Art Study.

73.     If Alkermes or Dr. Ehrich had disclosed the 2000 Prior Art Study to the Patent Office, the Patent Examiner would have found that the study by itself, or in combination with other information, rendered the claims of the patent application unpatentable. Specifically, the 2000 Prior Art Study would have rendered the claims anticipated or obvious when viewed in combination with other prior art or knowledge.

**2.     Alkermes and Dr. Ehrich intentionally withheld material prior art that would have refuted or shown inconsistencies with Dr. Ehrich's 2009 Declaration.**

74.     On May 5, 2009, the Patent Examiner rejected all pending claims as anticipated or obvious over prior art. On October 5, 2009, in response to this office action rejection, Alkermes

submitted a declaration under 37 C.F.R. § 1.132 from Dr. Elliot Ehrich ("2009 Declaration"). In that declaration, Dr. Ehrich attested that the "present invention is directed to the unexpected discovery that a single injection of a naltrexone-containing long-acting formulation provides systemic exposure to naltrexone (AUC) which is at least 2 fold higher over a 28 day period than the AUC of an oral regimen of 50 mg per day over a 28 day period." Dr. Ehrich also stated: "based on what was known in the prior art…, it was unexpected that an injectable naltrexone formulation such as MEDISORB® Naltrexone formulation would have an AUC of at least 3.3 times greater than that of 50 mg oral Naltrexone." Alkermes and Dr. Ehrich made these statements in opposing the Patent Examiner's argument of unpatentability, and at the same time, asserting an argument of patentability.

75.     The '167 Application specification similarly provides: "[t]his invention arose from the unexpected discovery that substantially improved serum levels of naltrexone can be achieved by administering long acting formulations of naltrexone, such as Alkermes, Inc. formulation, Vivitrex® injectable suspension. . . . Indeed, it was not expected that serum levels of about 3.3 times that achieved by a 50 mg/day oral dose could be achieved by a single IM administration of Vivitrex®." *See* '499 patent at 2:29-36.

76.     However, the alleged "unexpected discovery" as described in the specification of the '167 Application and Dr. Ehrich's 2009 Declaration was not unexpected. Instead, Alkermes and Dr. Ehrich had known about this result for years and had known of its disclosure to members of the public in December 2000 and thereafter.

77.     The 2000 Prior Art Study directly contradicts Dr. Ehrich's 2009 Declaration. As discussed above, the 2000 Prior Art Study disclosed a ratio of the AUC for the 380-mg injectable dosage to be at least 3 times the known AUC value of the 50-mg dosage. In other words, the

2000 Prior Art Study would have been understood by a person of ordinary skill in the art to have disclosed the same dosing and AUC values that Dr. Ehrich's 2009 Declaration falsely claimed was "unexpected." Alkermes and Dr. Ehrich each had known of this result since 2000—and thus, this result could not be "unexpected" in 2004.

**3.    The intentional concealment of the 2000 Prior Art Study and the false statements in Dr. Ehrich's 2009 Declaration fraudulently induced the Patent Office to issue the '499 patent.**

78.    Alkermes' and Dr. Ehrich's intentional withholding of the 2000 Prior Art Study, independently, or together with the false statements submitted in the 2009 Declaration, had the intended effect of fraudulently inducing the Patent Office to issue the '499 patent when it otherwise would not have done so.

79.    In clear and express reliance on Dr. Ehrich's 2009 Declaration, the Patent Examiner withdrew its prior rejections and stated:

> The declaration filed October 5, 2009 has been considered and found persuasive. Particularly, the Applicant's application exhibits a serum AUC of naltrexone at least about three times or at least about two times greater than that achieved by 50 mg/day oral administration, whereas the formulation of Tice is similar to a 50 mg/day oral administration. In light of the declaration and/or the Applicant's arguments, the 35 U.S.C. 102(b) and 103(a) rejections are withdrawn.

80.    Upon resolving its rejections, the Patent Examiner issued a Notice of Allowance for all the pending claims. Notably, as the direct result of Alkermes' and Dr. Ehrich's intentional withholding of the 2000 Prior Art Study, the Patent Examiner expressly found there "is no prior art disclosing the applicant's composition and effect, particularly an AUC about three times greater than that achieved by 50 mg/day oral administration." In allowing the patent to issue, the Patent Examiner expressly relied on Dr. Ehrich's 2009 Declaration as *the* proof that "the claimed invention demonstrates the claimed properties over [the prior art]." The Patent Examiner would not have allowed the pending claims but for Alkermes' and Dr. Ehrich's intentional withholding

of the 2000 Prior Art Study, which had been made available to members of the public in 2000 to the conferees in San Juan, well over one year before the priority date, and the false statements in Dr. Ehrich's 2009 Declaration.

**4.    Alkermes and Dr. Ehrich acted with intent to deceive the Patent Office.**

81.    Alkermes and Dr. Ehrich acted with intent to deceive the Patent Office. Dr. Ehrich is the sole named inventor listed in the '499 patent. Dr. Ehrich and other Alkermes employees were the co-authors of the 2000 Prior Art Study and its abstract.

82.    Alkermes started the 2000 Prior Art Study when Dr. Ehrich joined Alkermes in July 2000.  Alkermes and Dr. Ehrich each knew that the results of the 2000 Prior Art Study had been accepted to be presented and ultimately were presented at the conference of the American College of Neuropsychopharmacology in Puerto Rico in December 2000 and then published shortly thereafter in its related written conference publication.  As one of its co-authors, Dr. Ehrich knew of the 2000 Prior Art Study, but intentionally did not disclose it to the Patent Office or mention it in his 2009 Declaration.

83.    Alkermes likewise knew of the 2000 Prior Art Study it conducted but intentionally did not disclose it to the Patent Office.  Alkermes also knew that the statements made in Dr. Ehrich's 2009 Declaration were false.  But this was precisely the point.  The intentional withholding of the 2000 Prior Art Study, either on its own or coupled with the false representations made in Dr. Ehrich's 2009 Declaration, virtually guaranteed the fraudulently-induced issuance of the '499 patent. Thus, not only did Dr. Ehrich knowingly make false statements to the Patent Office, but Alkermes, the originator of the 2000 Prior Art Study, sole assignee of the '499 patent, and prosecutor of the Hatch-Waxman litigation, similarly deceived the Patent Office and knew of the '499 patent's fatal infirmities.

5.    **Alkermes wrongfully listed its fraudulently-obtained '499 patent in the Orange Book.**

84.    Although Alkermes knew it had obtained the '499 patent by fraud, Alkermes nonetheless submitted the '499 patent for listing in the Orange Book on May 16, 2011, albeit after the 30-day Orange Book listing deadline established by 21 U.S.C. § 355(c)(2) had expired.

85.    In submitting the '499 patent for listing in the Orange Book in May 2011, Alkermes did not claim the '499 patent covered either the Vivitrol drug substance (DS) or the Vivitrol drug product (DP).  Instead, Alkermes listed the '499 patent for Vivitrol under two method-of-use codes, one for alcohol dependence and the other for preventing opioid relapse. These two methods-of-use codes were consistent with the indications for Vivitrol that the FDA had already approved.

86.    All 18 of the other patents Alkermes listed for Vivitrol in the Orange Book expired by May 25, 2020.  As issued, the '499 patent has an October 2029 expiration date.

87.    Even as untimely as it was, Alkermes' listing of the '499 patent in the Orange Book had its intended effect.  The late 2011 listing of the fraudulently-obtained '499 patent in the Orange Book would nevertheless force all would-be generic competitors looking to launch before the 2029 expiration of the '499 patent to submit their ANDA to the FDA with a Paragraph IV certification, which, in turn, would then enable Alkermes to initiate litigation to at least trigger the automatic stay that would prevent the FDA from approving any generic Vivitrol for up to 30 months.

C.    **In 2018, Generic Manufacturer Amneal Instituted *Inter Partes* Review Proceedings That, But For Alkermes' Inducements To Settle, Would Have Resulted In The Invalidation Of The Relevant Claims Of The '499 Patent In 2019 And Paved The Way For Generic Competition To Start As Early As 2020.**

88.    In April 2018, roughly two years before the last of Alkermes' 18 other Vivitrol patents expired, generic manufacturer Amneal filed a petition for *inter partes* review ("IPR")

with the Patent Trial and Appeals Board (IPR2018-00943), seeking to invalidate the relevant claims of the '499 patent as anticipated and/or obvious in light of various prior art.[7]

89.     Amneal had not yet filed an ANDA seeking FDA approval to market a generic Vivitrol product.

90.     Alkermes opposed institution of the IPR in its August 2018 filing, reiterating and perpetuating the same deceptions that fraudulently-induced the Patent Office to issue the '499 patent.  Alkermes again relied upon and cited the false statements in Dr. Ehrich's 2009 Declaration.  Alkermes again made the same false and misleading arguments it previously made to the Patent Examiner, this time to the Patent Office's Patent Trial and Appeals Board without disclosing the 2000 Prior Art Study, the publication in 2000 in San Juan of the Study's abstract, the 2000 in-person presentation in San Juan of the results of the 2000 Prior Art Study, including its dosing and AUC values, or the related disclosure of the Study's abstract in the conference's written publication disseminated shortly thereafter.  In doing so, Alkermes perpetuated and concealed Alkermes' fraud on the Patent Office, and furthered Alkermes' overall scheme.

91.     Under applicable law, 35 U.S.C. § 314(a), the Patent Trial and Appeals Board cannot grant such IPR petition and thereby institute proceedings that could lead to invalidation of the '499 patent unless "there is a reasonable likelihood that the petition would prevail."

92.     In November 2018, the Patent Trial and Appeals Board granted Amneal's petition and instituted IPR proceedings.  It concluded that "Petitioner [Amneal] has demonstrated a reasonable likelihood of success in proving that at least one claim of the '499 patent is unpatentable."  Significantly, the Patent Trial and Appeals Board granted Amneal's petition

---

[7] Invalidation of the relevant claims of the '499 patent would also force Alkermes to withdraw the patent from the Orange Book.

against "all challenged claims . . . of the '499 patent, based on all [six] grounds raised in the Petition."  This ruling was a strong indicator that all relevant claims of the '499 patent would very likely be invalidated at the conclusion of the IPR proceedings.

93.     After the Patent Trial and Appeals Board granted Amneal's petition and instituted IPR proceedings, Alkermes again reiterated and perpetuated its baseless and sham defense of the '499 patent in at least two different 2019 filings.  In those filings, Alkermes again cited and relied upon the false statements in Dr. Ehrich's 2009 Declaration, and again intentionally did not disclose the 2000 Prior Art Study or any of its related subsequent publications.  In doing so, Alkermes again perpetuated and concealed Alkermes' fraud on the Patent Office, and furthered Alkermes' overall scheme.

94.     Just hours before the start of that *inter partes* trial, Alkermes induced Amneal to settle and thereby preserve the '499 patent so that Alkermes could continue to wield the '499 patent against other would-be generic Vivitrol competitors.

95.     Alkermes induced Amneal to settle by providing Amneal a license to market a generic Vivitrol product, which public disclosures stated was a "non-exclusive [and] royalty-free license" to "market and sell Vivitrol in the U.S. beginning sometime in 2028 or earlier under certain circumstances." The terms of the settlement between Alkermes and Amneal were otherwise strictly kept secret.

96.     Because Amneal had not yet filed an ANDA, Alkermes' settlement provided at least two other inducements to Amneal, other than just giving Amneal the right to enter the generic market roughly a year before the expiration of Alkermes' fraudulently obtained '499 patent.

97.     First, the settlement amounted to a royalty-free "authorized generic" licensing

deal.  This means that Alkermes agreed that Amneal would sell Alkermes' brand product under a generic label, under commercial terms that were very favorable to Amneal.

98.    Second, the settlement also meant that Amneal would not have to pay the millions it ordinarily costs to develop its own generic product, file an ANDA, and work through the FDA approval process, not to mention the significant additional expense of having to litigate any related Hatch-Waxman litigation for up to 30 more months.

99.    By settling with Amneal before Amneal filed an ANDA, Alkermes also achieved more than simply avoiding the invalidation of the '499 patent.  It preserved the ability of a would-be generic competitor to be the first-to-file ANDA with a Paragraph IV certification and thereby qualify to obtain 180-days market exclusivity.  Once that first-filer served Alkermes notice of its ANDA filing, as required by law, Alkermes could then file Hatch-Waxman litigation against that first-filer and thereby trigger, at that point, the automatic 30-month stay of any FDA generic approval.  These procedural steps alone assured Alkermes the means to still further delay generic competition unlawfully.

100.    In addition, Alkermes' later negotiation of a Hatch-Waxman litigation settlement with the first-filer ANDA could also provide Alkermes with the means to further delay generic competition that are not available through settlements with subsequent ANDA filers.  For example, the FDA cannot usually approve a subsequent filer's ANDA until after the first-filer's 180-day exclusivity has run, and that 180-day exclusivity typically does not start until the first-filer commercially launches its generic.  So, if Alkermes induced the first-filer to delay its launch, Alkermes could also thereby delay all subsequent ANDA filers from launching too.

101.    Also, by settling with Amneal in the absence of an ANDA on file, Alkermes avoided having to disclose the terms of its settlement to either the Department of Justice ("DOJ")

or the Federal Trade Commission ("FTC"), as otherwise would have been required if an ANDA had been filed. *See* Medicare Prescription Drug, Improvement, and Modernization Act of 2003, § 1112(a) (limiting required disclosure of brand-generic agreements to only those involving a "generic drug applicant that has submitted an ANDA").

**D.    In 2020, Generic Manufacturer Teva Filed The First Vivitrol ANDA Prompting Alkermes To File Sham Hatch-Waxman Litigation And Thereby Trigger The Automatic 30-Month Stay Of FDA Approval.**

102.    In June 2020, after or around the time the last of Alkermes' 18 other Vivitrol Orange Book-listed patents expired, Teva filed the first ANDA seeking the FDA's approval to launch generic Vivitrol (ANDA 213195).

103.    Teva's ANDA included a Paragraph IV certification to the '499 patent, certifying to the FDA under oath that Alkermes' '499 patent was invalid, unenforceable, or would not be infringed by Teva's generic Vivitrol ANDA product.

104.    Alkermes responded to Teva's Paragraph IV Certification by timely filing a Hatch-Waxman suit against Teva in the District of New Jersey, *Alkermes, Inc. v. Teva Pharmaceuticals USA, Inc.*, 20-cv-12470 (D.N.J.), triggering the automatic stay of the FDA's approval of Teva's ANDA for up to 30-months.

105.    Notwithstanding the deceptive intent outlined above, and regardless of whether a finder of fact accepts that the '499 patent was fraudulently obtained, the infirmities in the '499 patent described above (e.g. with respect to prior art, inventorship, etc.) were known at the time Alkermes filed suit, and thus serve as an independent basis to find that Alkermes' lawsuit against Teva was a sham even if there was no fraud in the actual procurement and listing of the patent in the Orange Book.

106.    At the time of filing, Alkermes' suit against Teva was both objectively and subjectively baseless, and therefore a sham. Alkermes instituted that suit not for its merits

(indeed there were none), but instead to trigger the automatic 30-month stay and to otherwise delay generic competition.[8]  Alkermes also knew that any delay of Teva's launch would delay triggering Teva's 180-day exclusivity, which, in turn, could delay later generic entrants.

107.    Alkermes' suit was objectively and subjectively baseless because it was predicated on (i) the '499 patent, which Alkermes knew it had obtained by fraud and was therefore invalid and unenforceable *ab initio*, and (ii) Alkermes' wrongful listing of that patent in the Orange Book.

108.    Alkermes' suit was also objectively baseless because the '499 patent was otherwise invalid as obvious and/or anticipated by prior art.

109.    In response to Alkermes' complaint, Teva counterclaimed for a declaratory judgment that the '499 patent was invalid.

110.    Teva's case for invalidity was built on the groundwork already laid by Amneal's

---

[8] Given the nature of the fraud Alkermes and Dr. Ehrich perpetrated to induce the issuance of the '499 patent, Alkermes' Hatch-Waxman litigation against Teva was so objectively baseless that the subjective baselessness of Alkermes' decision to file such suit (*i.e.*, Alkermes' anticompetitive intent) can be readily inferred.  *See FTC v. Abbvie*, 976 F.3d 327, 370 (3d Cir. 2020) ("because the decisionmakers knew the lawsuits were baseless, they must have been motivated by something other than success on the merits.").  Moreover, the Alkermes decisionmakers knew Vivitrol was its most important proprietary product.  Vivitrol achieved $400 million in net sales in FY 2023, and it was of utmost significance to Alkermes' bottom line.  From 2009 (when Dr. Ehrich submitted his declaration) to 2014, Vivitrol was Alkermes' sole proprietary product.  By 2020, Vivitrol accounted for over 50% of Alkermes' annual proprietary product sales and nearly 30% of its total revenue. Further, Vivitrol's growth from its launch through 2024 (if not up to the present day) represented a significant economic interest to Alkermes and a substantial portion of Alkermes' total revenue, accounting for up to 30% of its total revenue from FY 2020 to 2023, and nearly half of its total proprietary product sales in that period. Obtaining, maintaining, asserting, and preventing the invalidation of, the '499 patent was critical to Alkermes' continued financial success, as it represented the only patent protecting Vivitrol after 2020.

successful institution of *inter partes* review proceedings.

111.    Throughout the Teva litigation, Alkermes continued to press the same baseless and sham defense of the '499 patent, including its reliance on Dr. Ehrich's 2009 Declaration in support of its false "unexpected results" narrative.  In doing so, Alkermes sought to perpetuate and conceal Alkermes' fraud on the Patent Office and to further its overall scheme.

112.    The parties litigated the case through trial, the closing arguments for which were held in June 2023.

113.    The evidence at trial spelled certain doom for the '499 patent.  Under cross-examination, the patent's inventor, Dr. Ehrich, admitted that the unexpected results to which his 2009 Declaration had attested in fact had been disclosed, years earlier, by the 2000 Prior Art Study.  Thus, the claimed basis for issuance of the '499 patent – the unexpected results – was false. Those results were known and disclosed in the 2000 Prior Art Study, which results were, in turn, published to the conferees in San Juan in 2000 and in the related written conference publication shortly thereafter, three years before the priority date.  Alkermes and Dr. Ehrich knew about and intentionally withheld the 2000 Prior Art Study from the Patent Office precisely because it would have resulted in the Examiner's rejection of the application.  But for that fraud, the '499 patent would never have issued.

**E.    In 2023, Alkermes Induced Teva To Settle With An Agreement To Delay Its Generic Launch Until 2027.**

114.    Following the trial's June 2023 closing arguments, the FDA granted Final Approval to Teva's Vivitrol ANDA on July 6, 2023.

115.    With the post-trial Final Judgment invalidating the '499 patent imminent, Alkermes induced Teva to drop the litigation and delay its launch of its FDA-approved generic until January 2027, 2 years and 9 months before the expiration of the fraudulently-obtained '499

patent but 7 years after all the other Alkermes' Vivitrol patents expired in 2020.

**F.    Absent Alkermes' Monopolization Scheme, Generic Vivitrol Would Have Launched As Early As May 26, 2020, The Day After The Last Of All The Other 18 Vivitrol Patents Expired.**

116.    In the absence of the Alkermes' fraud, the Patent Office would have never issued the '499 patent.

117.    Alkermes should have never obtained, much less wrongfully listed, the '499 patent in the Orange Book as it did.

118.    The last of all 18 of the other Vivitrol patents listed in the Orange Book expired on May 25, 2020.

119.    In the absence of Alkermes' unlawfully obtaining the '499 patent by fraud and wrongfully listing that patent in the Orange Book, there would have been no way for Alkermes to delay the FDA's review and approval of any generic Vivitrol ANDA upon the May 25, 2020 expiration of the last of all 18 of the other Vivitrol patents.

120.    Similarly, and independent from Alkermes' fraud on the Patent Office, in the absence of Alkermes contesting Amneal's IPR on a sham and fraudulent basis, inducing Amneal to drop its IPR challenge, and subsequently unlawfully maintaining the '499 patent in the Orange Book, there would have been no way for Alkermes to delay the FDA's review and approval of any generic Vivitrol ANDA upon the May 25, 2020 expiration of the last of all 18 of the other Vivitrol patents.

121.    Likewise, and independent from Alkermes' fraud on the Patent Office, in the absence of Alkermes bringing sham litigation against Teva and subsequently inducing Teva to both delay entry and drop its challenge to the '499 patent, there would have been no way for Alkermes to obtain the automatic 30-month stay of Teva's FDA approval and/or to "park" Teva's first-filer 180-day exclusivity period as another potential barrier to would-be generic

competition.  Accordingly, there would have been no way for Alkermes to delay the FDA's review and approval of any generic Vivitrol ANDA upon the May 25, 2020 expiration of the last of all 18 of the other Vivitrol patents.

122.    Alkermes' monopolization scheme disrupted the market and the timing that would otherwise apply to generic manufacturers' ANDA submissions and related generic product development efforts.

123.    In the absence of barriers associated with the '499 patent, generic manufacturers would have ordered themselves around the expectation that the last of all the Vivitrol patents would expire by May 25, 2020, and a generic injectable naltrexone product could therefore be approved by the FDA and launch as early as May 26, 2020.

124.    Generic manufacturers typically closely monitor the expiration dates of Orange Book-listed patents, and prioritize and time their ANDA submissions accordingly so that they can be first to market upon expiration of the last Orange Book-listed patent. This close monitoring is particularly true for brand drugs, like Vivitrol, that earn hundreds of millions of dollars in annual sales.

125.    For example, Teva has publicly stated that, "[t]o the extent that [it] succeed[s] in being the first to market a generic version of a product . . . [its] sales, profits and profitability can be substantially increased in the period following the introduction of such product."[9]  In an

---

[9] Form 10-K, Teva Pharmaceutical Industries Limited Annual Report For The Fiscal Year Ended December 31, 2021 at 28, *available at* https://d18rn0p25nwr6d.cloudfront.net/CIK-0000818686/3618a206-4439-4dd4-9f28-829638e583da.pdf.

instance where a generic company like Teva is "late to market," it must factor in that, financially, "the value isn't going to be . . . what it would have been" had it launched earlier.[10]

126.    Similarly, the FDA regularly pursues initiatives with "the aim of expediting access to safe and effective medications."  In 2022, the Director of the Office of Regulatory Operations within CDER at FDA noted in an interview that the FDA's work to maximize "use of its generic approval pathway for generic drugs" leads to faster approval times, which "also help many generic drugs gain approval as soon as patent and exclusivity protections expire."[11]  This is in keeping with the FDA's view that it "considers first generics to be important to public health, and prioritizes review of [such ANDAs]."[12]

127.    With that market expectation, generic manufacturers, including but not limited to Amneal (which filed its IPR petition in April 2018) and Teva (which filed its ANDA in July 2020 shortly after all the other Vivitrol patents expired but 8 years before the expiry of the '499 patent), would have filed ANDAs timed to obtain FDA final approval by May 26, 2020.

128.    In the absence of barriers associated with the '499 patent, generic manufacturers would all have instead filed ANDAs with Paragraph III certifications, and would not have had to factor for any of the substantial litigation costs and delays that inevitably result from Paragraph IV Hatch-Waxman litigation.  There would be no automatic 30-month stay and no first-filer 180-

---

[10] *See, e.g.*, Teva Pharmaceutical Industries Q4 2020 Earnings Call Transcript, Feb. 10, 2021, *available at* https://www.fool.com/earnings/call-transcripts/2021/02/10/teva-pharmaceutical-industries-teva-q4-2020-earnin/.

[11] *The Generic Drug Approval Process*, U.S. Food & Drug Admin. (Mar. 17, 2022), https://www.fda.gov/drugs/cder-conversations/generic-drug-approval-process.

[12] *First Generic Drug Approvals*, U.S. Food & Drug Admin. (Nov. 25, 2024), https://www.fda.gov/drugs/drug-and-biologic-approval-and-ind-activity-reports/first-generic-drug-approvals. In 2020, for instance, FDA approved 72 first generic drugs. *See* https://www.fda.gov/drugs/first-generic-drug-approvals/2020-first-generic-drug-approvals.

day exclusivity. Generic market exclusivity and its lucrative duration would depend on a generic manufacturer's ability to obtain FDA final approval ahead of its generic competitors. The race for generic approval would be on, and the largest sales and market share would go to the earliest movers, ensuring at least one, if not more, entrants on the first day after the 18 patents expired. This is how market entry in the generic market typically occurs in the absence of patent protection, and how it would have occurred absent Alkermes' unlawful conduct.

129.    Under FDA rules, in the absence of barriers associated with the '499 patent, these ANDA filers would all also benefit from the FDA's priority and/or expedited ANDA review and approval process. Such priority review typically is applied by the FDA to ANDAs for which there are no blocking Orange Book-listed patents and there is no generic yet on the market. When such review "is dependent on the expiration of a patent (*i.e.*, the submission contains a paragraph III certification) . . . . OGD and OPQ will seek to complete the review of the [ANDA] in a manner that would permit approval by the last applicable patent expiration date or exclusivity date." *See* FDA Manual of Policies and Procedures 5240.3 Rev. 4, Eff. Nov. 9, 2017 at 4. In other words, for ANDAs with only Paragraph III certifications (*i.e.*, generic manufacturers looking to market their generic product upon expiration of the brand drug's last patent, and facing no other exclusivities barring their entry), the FDA routinely expedites review and provides final approval to the ANDA on or within a few days of the patent's expiration date.

130.    Generic Vivitrol, the less-expensive generic alternative to brand Vivitrol to treat alcohol and opioid dependence, as is epidemic in this country, is the kind of product the FDA would typically prioritize for expedited approval.

131.    Absent Alkermes' anticompetitive conduct, Teva would have obtained final approval and launched its generic Vivitrol as soon as possible after the expiration of Alkermes'

18 patents in May 2020 or, at the very latest, immediately after Teva actually obtained FDA final approval in July 2023.

## VI.    CLASS ALLEGATIONS

132.    Plaintiff, on behalf of itself and all other similarly situated direct purchasers, seeks damages, measured as overcharges, trebled, against Alkermes on allegations of Alkermes' anticompetitive conduct in the market for injectable naltrexone (Vivitrol and its AB-rated generic equivalents).

133.    Plaintiff brings this action on behalf of itself and, under Fed. R. Civ. P. 23(a) and (b)(3), as representatives of a class of direct purchasers (the "Class" or the "Direct Purchaser Class") defined as follows:

> All persons who or entities which purchased Vivitrol in the United States or its territories and possessions directly from Alkermes at any time on or after May 26, 2020 through the present and until the anticompetitive effects of Alkermes' conduct cease (the "Class Period").
>
> Excluded from the Class are Alkermes and its officers, directors, management, employees, subsidiaries, or affiliates, and all governmental entities.

134.    Members of the Direct Purchaser Class are so numerous that joinder is impracticable. Further, the Direct Purchaser Class is readily identifiable from information and records in Alkermes' possession.

135.    Plaintiff's claims are typical of those of the Direct Purchaser Class. All class members were damaged by the same wrongful conduct of Alkermes -- *i.e.*, they paid artificially inflated prices for injectable naltrexone and were deprived of earlier and more robust competition from less-expensive generic Vivitrol as a result of Alkermes' wrongful conduct.

136.    Plaintiff will fairly and adequately protect and represent the interests of the Direct Purchaser Class. The interests of the Plaintiff are coincident with, and not antagonistic to, those

of the Direct Purchaser Class.

137.   The Plaintiff is represented by counsel with experience in the prosecution of class action antitrust litigation, and with particular expertise in pharmaceutical antitrust class actions.

138.   Questions of law and fact common to the members of the Direct Purchaser Class predominate over questions that may affect only individual class members because Alkermes has acted on grounds generally applicable to the entire Direct Purchaser Class thereby making overcharge damages with respect to the Class as a whole appropriate. Such generally applicable conduct is inherent in Alkermes' wrongful conduct.

139.   Questions of law and fact common to the Direct Purchaser Class include:

    i.    whether Alkermes willfully obtained and/or maintained monopoly power over injectable naltrexone;

    ii.    whether the '499 patent was obtained through fraud;

    iii.    whether Dr. Ehrich's 2009 Declaration misrepresented the unexpected results to the Patent Office;

    iv.    whether Alkermes and Dr. Ehrich withheld the 2000 Prior Art Study from the Patent Office;

    v.    whether the Patent Examiner would have continued to reject all claims and thereby never have issued the '499 patent but for Alkermes' and Dr. Ehrich's submission of Dr. Ehrich's 2009 Declaration and withholding of the 2000 Prior Art Study;

    vi.    whether Alkermes and Dr. Ehrich intended to deceive the Patent Office;

    vii.    whether Alkermes' listing of the '499 patent in the Orange Book was wrongful;

viii.     whether Alkermes induced Amneal to terminate the *inter partes* proceedings to delay generic entry and protect the '499 patent from invalidation;

ix.     whether Alkermes relied on its fraudulently-obtained '499 patent and wrongful Orange Book listing to initiate Hatch-Waxman litigation against would-be generic Teva to trigger the automatic 30-month stay of the FDA's ability to approve such generic;

x.     whether Alkermes' Hatch-Waxman litigation against Teva constituted sham litigation;

xi.     whether Alkermes induced Teva to settle the Hatch-Waxman litigation to delay generic entry and protect the '499 patent from invalidation;

xii.     whether in the absence of the fraudulently obtained and wrongfully listed '499 patent, Amneal and/or other generic manufacturers would have filed an ANDA before Teva did in 2020;

xiii.     whether in the absence of the fraudulently obtained and wrongfully listed '499 patent, Teva would have filed its ANDA sooner than it did in 2020;

xiv.     whether in the absence of the fraudulently obtained and wrongfully listed '499 patent, the FDA would have granted final approval to an ANDA sooner than its July 6, 2023 final approval of Teva's ANDA;

xv.     whether Alkermes' scheme to monopolize, either in whole or in part, violated Section 2 of the Sherman Act;

xvi.     when, in the absence of the unlawful conduct alleged herein, generic versions of Vivitrol would have launched;

xvii.    whether Alkermes' activities substantially affected interstate commerce;

xviii.    whether, and, if so, to what extent, Alkermes' conduct caused antitrust

injury (*i.e.*, overcharges) to the Plaintiff and the Class; and

xix.    the quantum of aggregate overcharge damages to the Class.

140.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

141.    Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## VII.    MARKET POWER AND DEFINITION

142.    The relevant geographic market is the United States and its territories and possessions.

143.    At all relevant times, Alkermes' share of the relevant injectable naltrexone market was 100%.

144.    At all relevant times, Alkermes had monopoly power in the market for injectable naltrexone, consisting of Vivitrol and its AB-rated generic equivalents. It had the power to maintain the price of Vivitrol at supra-competitive levels without losing substantial sales to other products prescribed and/or used for the same purposes as Vivitrol, with the exception of AB-rated generic injectable naltrexone. This market power may be shown directly, and therefore no relevant market needs to be defined.

145.    Manufacturers attempt to differentiate brand name drugs like Vivitrol based on features and benefits (including safety and efficacy), and not based on price. Doctors and patients are generally price-insensitive when prescribing and taking prescription drugs like Vivitrol. This is due in part to the presence of insurance that bears much of the cost of prescriptions and other institutional features of the pharmaceutical marketplace. Different patients may respond differently to different drugs and even drugs within its same therapeutic class do not constrain the price of Vivitrol.

146.    Other products are not practical substitutes for Vivitrol and its AB-rated generic injectable naltrexone substitutes. During the relevant period, other forms of similarly-indicated naltrexone have been freely available, but the presence of these alternatives did not result in lower Vivitrol prices.  In fact, Alkermes has been able to maintain and increase Vivitrol's price, thus confirming Alkermes' market power over the relevant injectable naltrexone market (Vivitrol and its AB-rated generic equivalents).

147.    Other various non-naltrexone alcohol dependence and/or preventative opioid relapse treatments may exist, but none exhibit cross price elasticity with Vivitrol and therefore do not constrain its price. The existence of these other products that may be used to treat similar indications did not constrain Alkermes' ability to raise or maintain Vivitrol prices without losing substantial sales, and therefore those other drug products are not in the same relevant antitrust market as Vivitrol. Therapeutic alternatives, to the extent existent, are not the same as economic alternatives.

148.    Functional similarities between Vivitrol and other similarly-indicated medicines, other than AB-rated generic Vivitrol equivalents, are insufficient to permit inclusion of those other molecules in the relevant market with Vivitrol. To be an economic substitute for antitrust

purposes, a functionally similar product must also exert sufficient pressure on the prices and sales of another product, so that the price of that product cannot be maintained above levels that would otherwise be maintained in a competitive market. No other similarly-indicated medication (except for AB-rated generic versions of Vivitrol) will take away sufficient sales of Vivitrol to prevent Alkermes from raising or maintaining the price of Vivitrol above levels that would otherwise prevail in a competitive market.

149.    Vivitrol is also not reasonably interchangeable with any products other than AB-rated generic versions of Vivitrol because Vivitrol has significantly differentiating attributes making it a unique drug product. The FDA does not consider Vivitrol interchangeable with any other medication (other than its AB-rated generic Vivitrol equivalents).

150.    Alkermes needed to control only Vivitrol and its AB-rated generic equivalents, and no other products, to maintain the price of Vivitrol at a supra-competitive level while preserving all or virtually all of its sales. Only the market entry of a competing, AB-rated generic version of Vivitrol would render Alkermes unable to maintain its monopoly prices of Vivitrol without losing substantial sales.

151.    Alkermes also sold Vivitrol at prices well in excess of marginal costs, and substantially in excess of the competitive price, and enjoyed high profit margins.

152.    Alkermes has exercised its power to exclude and restrict competition to Vivitrol and its AB-rated generic equivalents.

153.    Alkermes, at all relevant times, enjoyed high barriers to entry with respect to competition in the relevant injectable naltrexone product market due, in large part, to legally and illegally created patent protections, legally and illegally created regulatory bars to FDA approval of generic competitors, and high costs of entry and expansion.

154.    To the extent Plaintiff is legally required to prove monopoly power through circumstantial evidence by first defining a relevant product market, Plaintiff alleges that injectable naltrexone products (*i.e.*, Vivitrol and its AB-rated generic equivalents) is the relevant market. During the period relevant to this case, Alkermes has been able to profitably maintain the price of injectable naltrexone products well above competitive levels.

## VIII.   MARKET EFFECTS AND CLASS DAMAGES

155.    But for the anticompetitive conduct alleged above, multiple generic manufacturers would have entered the market with their generic injectable naltrexone products starting no later than May 26, 2020, when, but for Alkermes' monopolization scheme, the FDA would have likely started approving Vivitrol ANDAs for immediate market entry.

156.    Instead, Alkermes willfully and unlawfully maintained its monopoly power in the market for injectable naltrexone through its scheme to exclude competition. The scheme forestalled generic competition and carried out its anticompetitive effect of maintaining supra-competitive prices for Vivitrol. Alkermes implemented its scheme by improperly:  (i) obtaining the '499 patent by fraud; (ii) listing that fraudulently-obtained patent in the Orange Book; (iii) inducing Amneal to not invalidate the fraudulently-obtained patent; (iv) asserting sham Hatch-Waxman patent litigation on the basis of that fraudulently-obtained Orange Book-listed patent to trigger the 30-month stay of FDA approval of the Teva generic Vivitrol product; and (v) inducing Teva to not invalidate the fraudulently-obtained patent and agree to a later generic entry date. These acts, individually and/or in combination, were anticompetitive.

157.    If Alkermes had not obtained the '499 patent by fraud, listed it in the Orange Book, and filed related Paragraph IV litigation on the basis of that wrongfully listed and fraudulently-obtained patent, Alkermes could not have abused the Hatch-Waxman framework, as it did, as a vehicle to delay generic competition to Vivitrol beyond the 2020 expiration of all the

other Vivitrol patents.

158.    Alkermes' anticompetitive conduct had the purpose and effect of restraining competition unreasonably and injuring competition by protecting Vivitrol from generic competition.  Alkermes' actions allowed it to maintain a monopoly and exclude competition in the market for injectable naltrexone, *i.e.*, Vivitrol and its AB-rated generic equivalents, effectively preserving the market solely for the benefit of Alkermes' monopoly profits.

159.    Alkermes' exclusionary conduct has delayed, prevented, and impeded the efficient sale of and competition from AB-rated generic injectable naltrexone in the United States and unlawfully enabled Alkermes to sell Vivitrol without generic competition and thus, artificially inflated prices.

160.    Alkermes' anticompetitive conduct, which delayed the introduction into the U.S. marketplace of any AB-rated generic version of Vivitrol, caused Plaintiff and other members of the Class to pay more than they would have paid for injectable naltrexone.

## IX.    ANTITRUST IMPACT

161.    During the relevant period, Plaintiff and members of the Class purchased substantial amounts of Vivitrol directly from Alkermes. As a result of Alkermes' unlawful anticompetitive conduct, Plaintiff and other Class members were compelled to pay, and did pay, artificially inflated prices for Vivitrol. Those prices were substantially greater than the prices that Plaintiff and other Class members would have paid absent the illegal conduct alleged herein, because the price of injectable naltrexone was artificially inflated during the period of delay. Due to Alkermes' unlawful anticompetitive conduct, an AB-generic Vivitrol equivalent is not presently available in the United States.

162.    As a consequence, Plaintiff and other Class members have sustained and continue to sustain substantial losses and damage to their business and property in the form of

overcharges. The full amount and forms and components of such damages will be calculated after discovery and upon proof at trial.

### X.    CLAIM ACCRUAL AND/OR STATUTE OF LIMITATIONS TOLLING

163.    Plaintiff's Complaint is timely at least as to all claims accruing within four years of the date of the filing of this Complaint.

164.    Plaintiff's damages claims predating the four years immediately preceding the filing of this Complaint are also timely under the doctrines of equitable tolling, the discovery rule, and fraudulent concealment.

165.    These doctrines apply because: (i) Defendant intentionally concealed from Plaintiff the existence of this cause of action; (ii) Plaintiff could not have known about this cause of action until on or after February 2023 when evidence, obtained through confidential discovery, was presented publicly at the Teva trial that revealed: (a) the 2000 Prior Art Study that was presented in December 2000 at the meeting of the American College of Neuropsychoparmacology in San Juan, Puerto Rico, and (b) that the statements in Dr. Ehrich's 2009 Declaration upon which the Patent Examiner relied to withdraw the prior rejection and allow the '499 patent to issue were fraudulent; and (iii) Plaintiff's ignorance up until these February 2023 disclosures was not attributable to lack of diligence on its part.  Indeed, at the very beginning of that trial, Alkermes continued to perpetuate the false narrative that Dr. Ehrich first made the discovery covered by the '499 patent in 2004, when, as Dr. Ehrich was forced days later to admit, the 2000 Prior Art Study confirmed such discovery had in fact been made and disclosed in 2000.

166.    But for these public trial disclosures, Plaintiff may have continued to remain ignorant by virtue of the lengths and degree to which Alkermes kept its fraud secret.

167.    The monopolization scheme alleged herein depended in part on Alkermes keeping the particulars of its fraud secret, and hence was also inherently self-concealing.

168.    As a result of Alkermes' fraudulent concealment, all applicable statutes of limitations for the Plaintiff's and the Class's claims have been tolled until, at the earliest, the February 2023 trial.

169.    Even absent fraudulent concealment, all applicable statutes of limitations are tolled by the doctrine of equitable estoppel.

170.    Alternatively, if the statute of limitations is not tolled, this Complaint alleges a continuing course of conduct (including conduct within the limitations period), and Plaintiff and members of the Class can recover for damages that they suffered during the limitations period, *i.e.*, at least within the last four years.

## XI.    CLAIM FOR RELIEF

### COUNT I: 15 U.S.C. § 2 SCHEME TO MONOPOLIZE

171.    Plaintiff hereby incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

172.    As described above, starting on May 26, 2020 through the present day, Alkermes has unlawfully possessed monopoly power in the relevant injectable naltrexone market. During the relevant time period, no other manufacturer sold a competing, AB-rated generic injectable naltrexone product in the United States.

173.    Alkermes has willfully and unlawfully maintained its monopoly power in the injectable naltrexone market from 2020 through the present day, not as a result of providing a superior product, business acumen, or historical accident but by instead engaging in an anticompetitive scheme to keep generic AB-rated generic injectable naltrexone equivalents from entering the relevant market.

174.    Alkermes knowingly and intentionally engaged in an anticompetitive, overall scheme to maintain its Vivitrol monopoly power, the components of which either standing alone or in combination (in whole or in part) were designed to and in fact have delayed the launch of generic versions of Vivitrol. This scheme included:

- Alkermes' obtaining the '499 patent through *Walker Process*[13] fraud; specifically, Alkermes intended to deceive the Patent Office by: (i)intentionally withholding the 2000 Prior Art Study it was obligated by law to disclose; and/or (ii) intentionally submitting Dr. Ehrich's 2009 Declaration falsely attesting to "unexpected results" that the withheld 2000 Prior Art Study contradicted; but for these acts, the '499 patent would never have issued;

- Alkermes' wrongful listing and maintenance of the '499 patent in the Orange Book, knowing that the '499 patent was invalid and/or unenforceable because it had been obtained by fraud and/or was otherwise invalid as obvious and/or anticipated by prior art;

- Alkermes' assertion of the same fraud, deception, and sham arguments it presented to the Patent Office in contesting Amneal's IPR proceedings in 2018 and 2019;

- Alkermes' inducing Amneal in 2019 to drop its *inter partes* review challenge to save the '499 patent from invalidation and preserve its Vivitrol monopoly;

- Alkermes' use of the fraudulently-obtained and wrongfully listed '499 patent to institute sham Hatch-Waxman litigation against Teva to trigger the automatic 30-month stay of FDA generic approval;

- Alkermes' use of the fraudulently-obtained and wrongfully listed '499 patent to institute and maintain sham litigation against Teva, which litigation Alkermes instituted and maintained without regard to the merits but instead as the means to delay generic competition; and

- Alkermes' inducing Teva in 2023 to delay its generic entry until 2027 and drop its challenge to save the '499 patent from invalidation and preserve its Vivitrol monopoly.

175.    Alkermes' conduct was anticompetitive because it did not represent competition on the merits, was intended to and did frustrate competition, prevented injectable naltrexone

---

[13] *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172 (1965).

prices from falling to competitive levels, and was motivated by a desire to disrupt generic competition to Vivitrol.

176.    By means of this scheme, Alkermes intentionally and wrongfully maintained monopoly power with respect to Vivitrol in violation of Section 2 of the Sherman Act. As a result of this unlawful maintenance of monopoly power, Plaintiff and members of the Class paid artificially inflated prices for injectable naltrexone.

177.    Plaintiff and members of the Class have been injured in their business or property by Alkermes' antitrust violations. Their injury consists of having paid higher prices for injectable naltrexone than they would have paid in the absence of Alkermes' violations. Such injury, called "overcharges," is of the type the antitrust laws were designed to prevent, flows from that which makes Alkermes' conduct unlawful, and Plaintiff and the Class are the proper entities to bring an action concerning this conduct.

178.    Alkermes knew when it listed the '499 patent in the Orange Book that Alkermes had obtained that patent by fraud.  Alkermes also knew when it listed the '499 patent in the Orange Book that it had failed to do so within 30 days of its issuance, as required by law.

179.    Alkermes knew that the FDA did not police Orange Book listings and that Alkermes could therefore list the '499 patent in the Orange Book, notwithstanding the wrongfulness of such listing.  Alkermes also knew that the wrongful listing of the '499 patent in the Orange Book would nevertheless force ANDA applicants to file Paragraph IV certifications that would then provide Alkermes with the further ability to file Hatch-Waxman suits that would, among other things, trigger automatic stays of FDA approval of generic Vivitrol ANDAs for up to 30 months and provide further opportunity for other anticompetitive actions.

180.    Alkermes knowingly and intentionally used its wrongful listing of the '499 patent

to institute sham Hatch-Waxman litigation against Teva in 2020 to, among other things, trigger the 30-month automatic stay of FDA approval. Alkermes knew that in the absence of its wrongful listing of the '499 patent it otherwise had no basis to prevent Teva from obtaining FDA approval and launching upon the 2020 expiration of the last of its other Vivitrol Patents.

181.    The effect of Alkermes' unlawful monopolization scheme was to artificially extend Vivitrol exclusivity well beyond the 2020 expiration date of the last of the other Vivitrol Orange-Book listed patents.

182.    There is no valid procompetitive business justification for Alkermes' anticompetitive conduct, and to the extent Alkermes offers one, it is pre-textual and not cognizable. Any procompetitive benefits of Alkermes' conduct do not outweigh its anticompetitive harms.

## XII.    DEMAND FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the proposed Class, respectfully demands that the Court:

     i.    Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. Rule 23(a) and (b)(3), direct that reasonable notice of this action, as provided by Rule 23(c)(2), be given to the Class, and declare Plaintiff as the named representative of the Class;

    ii.    Conduct expedited discovery proceedings leading to a prompt trial on the merits before a jury on all claims and defenses;

   iii.    Enter judgment against Defendants and in favor of Plaintiff and the Class;

    iv.    Award damages (*i.e.*, three times overcharges) to the Plaintiff and the Class in an amount to be determined at trial, plus interest in accordance with law;

    v.    Award Plaintiff and the Class their costs of suit, including reasonable attorneys' fees as provided by law; and

    vi.    Award such further and additional relief as is necessary to correct for the anticompetitive market effects Defendants' unlawful conduct caused and as the Court may deem just and proper under the circumstances.

## XIII.   JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff, on behalf of itself

and the proposed Class, demands a trial by jury on all issues so triable.


Dated:  October 2, 2025                                    Respectfully submitted,

                                                          **VALUE DRUG COMPANY**

                                                          By:      _s/ Sean K. McElligott_____
                                                                   One of Its Attorneys

Bruce E. Gerstein                                         Sean K. McElligott (Mass. BBO #651710)
Dan Litvin                                                Steven L. Bloch
**GARWIN GERSTEIN & FISHER LLP**                          Johnathan Seredynski
88 Pine Street, 28th Floor                                **SILVER GOLUB & TEITELL LLP**
New York, NY 10005                                        One Landmark Square, 15th Floor
(212) 398-0055                                            Stamford, CT 06901
bgerstein@garwingerstein.com                              (203) 325-4491
dlitvin@garwingerstein.com                                smcelligott@sgtlaw.com
                                                          sbloch@sgtlaw.com
                                                          jseredynski@sgtlaw.com

David F. Sorensen
Caitlin G. Coslett                                        Peter Kohn
Andrew Curley                                             Joseph Lukens
**BERGER MONTAGUE PC**                                    **FARUQI & FARUQI LLP**
1818 Market Street, Suite 3600                            1617 JFK Blvd, Suite 1550
Philadelphia, PA 19103                                    Philadelphia, PA 19103
(215) 875-3000                                            (215) 277-5770
dsorensen@bm.net                                          pkohn@faruqilaw.com
ccoslett@bm.net                                           jlukens@faruqilaw.com
acurley@bm.net

                                                          Bradley J. Demuth
Stuart Des Roches                                         **FARUQI & FARUQI LLP**
Dan Chiorean                                              685 Third Avenue
Thomas Maas                                               New York, NY 10017
Caroline Hoffmann                                         (212) 983-9330
**ODOM & DES ROCHES LLC**                                 bdemuth@faruqilaw.com
650 Poydras Street, Suite 2350
New Orleans, LA 70130                                     Russell A. Chorush
(504) 522-0077                                            Chris First
stuart@odrlaw.com                                         Carlos Ruiz
dchiorean@ordlaw.com                                      **HEIM PAYNE & CHORUSH LLP**
tmaas@ordlaw.com                                          1111 Bagby Street, Suite 2100
choffmann@odrlaw.com                                      Houston, TX 77002
                                                          (713) 221-2000
                                                          rchorush@hpcllp.com
Susan Segura                                              cfirst@hpcllp.com
David C. Raphael                                          cruiz@hpcllp.com
**SMITH SEGURA RAPHAEL &**

**LEGER LLP**
221 Ansley Blvd.
Alexandria, LA 71303
(318) 445-4480
ssegura@ssrllp.com
draphael@ssrllp.com

*Counsel for Plaintiff and the Proposed Class*