**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

VALUE DRUG COMPANY, on behalf of itself and all others similarly situated,

Plaintiff,

v.

ALKERMES, INC., and ALKERMES PHARMA IRELAND LIMITED,

Defendants.

No. 1:25-cv-12872-JEK

**MEMORANDUM AND ORDER ON DEFENDANTS' MOTION TO DISMISS**

**KOBICK, J.**

Plaintiff Value Drug Company brings this putative class action lawsuit against defendants Alkermes, Inc. and Alkermes Pharma Ireland Limited (together, "Alkermes") for allegedly engaging in anticompetitive conduct in violation of section 2 of the Sherman Act, 15 U.S.C. § 2. Value Drug claims that Alkermes defrauded the U.S. Patent and Trademark Office ("USPTO") to obtain a patent in 2011 for its brand-name drug, Vivitrol. According to the complaint, Alkermes failed to disclose—in its 2005 patent application and in a 2009 supporting declaration submitted by its employee and the named inventor—a 2000 study as material prior art, and falsely stated in that application and supporting declaration that the patent claimed an "unexpected discovery." As a result of this fraud and other monopolistic actions, the complaint alleges, Alkermes delayed generic competition to Vivitrol and caused purchasers, like Value Drug, to pay more for the drug.

Pending before the Court is Alkermes' motion to dismiss for failure to state a claim. That motion will be granted in part and denied in part. Value Drug states a *Walker Process* fraud claim and thus a plausible violation of section 2 of the Sherman Act. Because it fails to adequately allege

fraudulent concealment, however, Value Drug cannot recover damages for purchases of Vivitrol that it made outside of the applicable four-year statute of limitations—that is, before October 2, 2021.

## BACKGROUND

The following facts are recounted based on the allegations in the complaint and documents subject to judicial notice or sufficiently referenced in that pleading.

In March 2005, Alkermes filed a new drug application ("NDA") with the Food and Drug Administration ("FDA") for its drug, Vivitrol, and applied for a patent with the USPTO to protect the drug's claimed invention. ECF 1, ¶¶ 49, 53.[1] The FDA approved the NDA to market Vivitrol in 2006 and again, as supplemented, in 2010. *Id.* ¶ 49. Manufactured and sold by Alkermes, Vivitrol is an intramuscular injection of naltrexone used to treat alcohol dependence and prevent relapse into opioid dependence. *Id.* ¶¶ 2, 11, 49. Alkermes has generated over $400 million in annual U.S. sales of this brand-name drug. *Id.* ¶¶ 2, 124.

In May 2009, the USPTO's patent examiner rejected Alkermes' patent application as obvious in light of prior art, which generally includes all public information from a year before the patent's priority date of April 22, 2004. *Id.* ¶¶ 57, 74; *see* 35 U.S.C. §§ 102(a)-(b). Alkermes responded in October 2009 by submitting a declaration under 37 C.F.R. § 1.132 from Dr. Elliot Ehrich, its employee and the patent's sole inventor. ECF 1, ¶¶ 55, 74. Dr. Ehrich averred that the claimed invention produced an "unexpected discovery" because "based on what was known in the prior art . . . , it was unexpected that an injectable naltrexone formulation . . . would have an AUC of at least 3.3 times greater than that of 50 mg oral Naltrexone." *Id.* ¶ 74 (quotation marks omitted);

[1] Pursuant to "a complex statutory scheme," a manufacturer must submit an NDA to the FDA for approval to market a new drug. *Caraco Pharm. Lab'ys, Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 404-05 (2012); *see* ECF 1, ¶¶ 18-19.

ECF 66-12, at 4. "AUC," short for "area under curve," refers to "the area underneath the concentration versus time curve, which measures the total amount of drug observed in a patient's bloodstream over time since administration of the drug," and is thus "indicative of drug in the body over time." *Endo Pharms. Inc. v. Teva Pharms. USA, Inc.*, 919 F.3d 1347, 1349 n.1 (Fed. Cir. 2019).

Having "considered and found persuasive" that declaration, the USPTO withdrew its rejections and concluded that there was "no prior art disclosing [Alkermes'] composition and effect, particularly an AUC about three times greater than that achieved by 50 mg/day oral administration." ECF 1, ¶¶ 79-80 (quotation marks omitted). Accordingly, it issued Alkermes U.S. Patent No. 7,919,499 (the "'499 patent") in April 2011 with an expiration date in October 2029. *Id.* ¶¶ 3, 9-10, 53, 86.[2] As relevant here, claim 1 of the patent discloses a "method for treating an individual in need of naltrexone" by "administering a long acting formulation comprising about 310 mg to about 480 mg of naltrexone and a biocompatible polymer to the individual wherein the serum AUC of naltrexone is about three times greater than that achieved by 50 mg/day oral administration and wherein the biocompatible polymer is a polylactide-coglycolide polymer." *Id.* ¶ 66 (quotation marks omitted); ECF 66-1, at 17.

Value Drug alleges that Alkermes and Dr. Ehrich intentionally misled the USPTO in the initial 2005 patent application and his 2009 declaration by withholding—in violation of the "duty to disclose" under 37 C.F.R. § 1.56—material prior art: a study from 2000 that he co-authored. ECF 1, ¶¶ 61-66, 81-83.[3] Presented by another Alkermes employee, Dr. Raymond Bartus, in

---

[2] Alkermes had eighteen other patents related to Vivitrol that expired on May 25, 2020 and are not at issue in this litigation. ECF 1, ¶¶ 3-4, 49, 86, 118.

[3] "Applicants for patents are required to prosecute patent applications in the [US]PTO with candor, good faith, and honesty." *Massachusetts Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 412 F.3d 215, 236 n.12 (1st Cir. 2005) (quotation marks omitted).

December 2000 at a conference held by the American College of Neuropsychopharmacology in Puerto Rico, the study showed that a 300- or 380-mg intramuscular injectable dosage of naltrexone—encapsulated in a biodegradable, polyactide-co-glycolide polymer—yielded an AUC value at least three times more than that of a 50-mg oral dosage. *Id.* ¶¶ 56, 63, 67-68, 82. That study, Value Drug asserts, involved the same biocompatible polymer ("polylactide-coglycolide polymer"), used a similar dosage ("about 310 mg"), and produced nearly identical AUC values ("about three times greater than that achieved by 50 mg/day oral administration") as claimed in the '499 patent. *Id.* ¶¶ 66-69, 77 (quotation marks omitted). The 2000 study was published in 2001 and cited in another article, also co-authored by Dr. Ehrich, in 2004. *Id.* ¶¶ 71-72. Had this study been disclosed, Value Drug alleges, the USPTO would have rejected Alkermes' patent application because its claims were anticipated or obvious given this prior art. *Id.* ¶ 73. Yet notwithstanding the substantially similar 2000 study authored by Dr. Ehrich, the patent application and Dr. Ehrich's supporting declaration both stated that the injection formulation had produced "unexpected" results. *Id.* ¶¶ 74-76 (quotation marks omitted).

In May 2011, Alkermes submitted the '499 patent to the FDA for its inclusion in the Orange Book. *Id.* ¶¶ 10, 84-85.[4] A generic drug manufacturer named Amneal petitioned for *inter partes* review ("IPR") of that patent in April 2018, seeking to invalidate it as anticipated or obvious. *Id.* ¶ 88.[5] In November 2018, over Alkermes' opposition, the USPTO's Patent Trial and Appeals Board

[4] This Book is "an annual publication of all approved drugs and the reported patents or statutory exclusivities that cover those drugs," including their expiration dates. *In re Nexium (Esomeprazole) Antitrust Litig.*, 842 F.3d 34, 40 (1st Cir. 2016); *see* ECF 1, ¶ 19.

[5] The IPR process aims to "improve patent quality and limit unnecessary and counterproductive litigation costs." *Uniloc 2017 LLC v. Hulu, LLC*, 966 F.3d 1295, 1297 (Fed. Cir. 2020) (quotation marks omitted). Through IPR, the USPTO may "reconsider whether existing patents satisfy the novelty and nonobviousness requirements for inventions." *United States v. Arthrex, Inc.*, 594 U.S. 1, 8 (2021); *see* 35 U.S.C. § 102 (novelty); *id.* § 103 (non-obvious subject matter); ECF 1, ¶ 38.

("PTAB") granted the petition and concluded that Amneal had "demonstrated a reasonable likelihood of success in proving that at least one claim of the '499 patent is unpatentable." *Id.* ¶¶ 90-92 (quotation marks omitted). The parties settled before the PTAB issued a final written decision, however, with Alkermes agreeing to provide Amneal a "non-exclusive [and] royalty-free license" to market a generic Vivitrol product "in 2028 or earlier under certain circumstances." *Id.* ¶¶ 94-95 (quotation marks omitted). This agreement allowed Amneal to sell Vivitrol under Amneal's generic label without having to produce, and obtain FDA approval for, its own generic product. *Id.* ¶¶ 96-98. In exchange, among other benefits, Alkermes avoided the potential invalidation of its '499 patent. *Id.* ¶¶ 99, 101.

In June 2020, another generic drug manufacturer called Teva Pharmaceuticals USA, Inc. submitted an abbreviated new drug application ("ANDA"), seeking FDA approval of its generic version of Vivitrol. *Id.* ¶ 102.[6] Teva's ANDA included a paragraph IV certification, asserting that the '499 patent was invalid. *Id.* ¶¶ 29, 103; *see* 21 U.S.C. § 355(j)(2)(A)(vii)(IV). Because a paragraph IV certification "is an act of infringement under patent law," *Hikma Pharms. USA Inc. v. Amarin Pharma, Inc.*, 146 S. Ct. 1391, 1397 (2026), Alkermes responded by filing a patent infringement lawsuit against Teva in the U.S. District Court for the District of New Jersey, ECF 1, ¶ 104. That lawsuit, which Alkermes filed within 45 days of receiving that certification, triggered an automatic 30-month stay of FDA approval of Teva's ANDA. *Id.* ¶¶ 12, 30, 104, 121; *see United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v. Novartis Pharms. Corp.*, 902 F.3d 1, 7 n.3 (1st Cir. 2018) (citing 21 U.S.C. § 355(j)(5)(B)(iii)). The lawsuit was allegedly a

[6] Since the "typical ANDA shows that the generic drug has the same active ingredients as, and is biologically equivalent to, the brand-name drug," the generic manufacturer can "piggy-bac[k] on the brand's NDA" and "thereby avoid the costly and time-consuming studies required for a pioneer drug." *Hikma Pharms. USA Inc. v. Amarin Pharma, Inc.*, 146 S. Ct. 1391, 1396-97 (2026) (quotation marks omitted); *see* ECF 1, ¶¶ 25-26.

"sham" and "baseless" because Alkermes knew that its '499 patent was invalid based on the prior art of the 2000 study. ECF 1, ¶¶ 105-08.

Alkermes and Teva proceeded to a bench trial in February 2023. *Id.* ¶¶ 112, 165. On cross-examination, Dr. Ehrich testified that based on the 2000 study's abstract, it was "reasonable to suppose that the [28-day] AUC of a 380-milligram [injectable] dose [of naltrexone] is going to be somewhere between . . . a hundred and 150 nanogram days per milliliter," which translates to a daily AUC value of 3.571 and 5.357 nanogram-days per milliliter, respectively.[7] ECF 66-4, at 754:10-14; *see* ECF 1, ¶ 113. By 2000, it was known in the art that the AUC value of 50-mg oral naltrexone was either 1.158 or 1.278 nanogram-days per milliliter. ECF 1, ¶ 67; *see* ECF 66-12, at 2-3.[8] Accordingly, it was known in 2000 that the AUC of the injectable dosage (between 3.571 and 5.357) was, as Dr. Ehrich testified, "approximately threefold higher than . . . the [50-mg] oral dosage" (1.158 or 1.278). ECF 66-4, at 696:18-21. Dr. Ehrich could not recall whether he had "made public data for the AUC from zero to 28 days of Alkermes's long-acting naltrexone formulation that pointed to AUCs in this very range . . . as early as December of 2000"—i.e., from the study that year. *Id.* at 742:2-6. But he testified that these results were "unexpected" only for those "[o]utside of the company." *Id.* at 740:3-7. According to Value Drug, this testimony "spelled certain doom for the '499 patent," because Dr. Ehrich had admitted on cross-examination "that the unexpected results" claimed as the basis for the '499 patent were, in fact, known as prior art based on the 2000 study. ECF 1, ¶ 113.

[7] The daily AUC value is calculated by taking the 28-day AUC value from the study and dividing by 28. *See* ECF 66, at 40 n.11 (addendum).

[8] The former value is calculated by taking the 27.8 microgram-hours per liter referenced in the declaration and dividing by 24, the number of hours in a day. *See* ECF 66, at 40 n.12 (addendum).

In July 2023, a month after closing arguments in the bench trial, Teva obtained final approval from the FDA for its ANDA. *Id.* ¶¶ 112, 114. Teva and Alkermes settled the following month, before the District Court could issue its findings and conclusions. *Id.* ¶ 115; *see* ECF 258, *Alkermes, Inc. v. Teva Pharm. USA, Inc.*, No. 20-cv-12470 (D.N.J. Aug. 30, 2023). The settlement permitted Teva to launch its generic drug in January 2027, almost three years before the October 2029 expiration of the '499 patent. ECF 1, ¶¶ 6(f), 115.

In December 2024, Argentum Pharmaceuticals LLC, another pharmaceutical company, requested *ex parte* reexamination of the '499 patent. ECF 66-5.[9] In connection with that proceeding before the USPTO, Alkermes submitted 184 nonpatent documents, including Dr. Ehrich's entire trial testimony from the Teva lawsuit. ECF 66-6. The patent examiner, Lora E. Barnhart Driscoll, signed Alkermes' list of references on August 18, 2025 as the "Date Considered" and stated at the bottom of the page disclosing the trial transcripts: "ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH" followed by her initials "LBD." *Id.* at 10.[10] The USPTO confirmed

[9] This request, along with the patent's further prosecution history, are attached as exhibits to Alkermes' motion to dismiss and were not referenced in the complaint. But as it acknowledged at the motion hearing, Value Drug neither disputes these materials' authenticity nor contends that they are not subject to judicial notice as public records on a motion to dismiss. The Court will therefore consider the submitted prosecution history in evaluating this motion. *See Premca Extra Income Fund LP v. Angle*, 178 F.4th 712, 718 (1st Cir. 2026) (permitting courts to consider "documents the authenticity of which are not disputed by the parties" and "official public records" at the pleading stage (quotation marks omitted)); *United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v. Novartis Pharms. Corp.*, No. 15-cv-12732-ADB, 2017 WL 2837002, at *3 n.5 (D. Mass. June 30, 2017) ("[B]ecause documents in the patent's prosecution history are public records, the Court may take judicial notice of their contents."), *aff'd*, 902 F.3d 1 (1st Cir. 2018).

[10] Under the governing manual, patent examiners "will no longer initial each reference citation considered, but will continue to strikethrough each citation not considered." USPTO, Manual of Patent Examining Procedure § 609 (9th ed. Nov. 2024).

the '499 patent's claims in August 2025 and issued a reexamination certificate reaffirming patentability in October 2025. ECF 66-7, 66-8.

Value Drug brought this putative class action lawsuit against Alkermes on October 2, 2025, asserting a single claim under section 2 of the Sherman Act, 15 U.S.C. § 2. ECF 1, ¶¶ 171-82. The complaint alleges that, over the past two decades, Alkermes has engaged in a "scheme" to monopolize the injectable naltrexone market and delay generic competition to Vivitrol. *Id.* ¶¶ 1, 5-8, 15, 122, 167. Absent such conduct, Value Drug alleges, cheaper generic injectable naltrexone would have been available in the United States around May 26, 2020, the day after Alkermes' other patents for Vivitrol expired. *Id.* ¶¶ 4, 123, 127, 131, 155; *see supra* note 2. The absence of those generic drugs has allegedly caused purchasers, like Value Drug, to pay more for Vivitrol, leading to "several hundreds of millions of dollars in overcharges that [they] would not have otherwise paid." *Id.* ¶¶ 7-8, 43, 160-62. Value Drug seeks to represent a class composed of those who similarly "purchased Vivitrol in the United States or its territories and possessions directly from Alkermes at any time on or after May 26, 2020 through the present and until the anticompetitive effects of Alkermes' conduct cease." *Id.* ¶ 133; *see id.* ¶ 5.[11]

Alkermes moved to dismiss the complaint for failure to state a claim. ECF 65. After Value Drug opposed that motion and Alkermes filed a reply, the Court held a hearing and took the motion under advisement. ECF 74, 77, 89.

**STANDARD OF REVIEW**

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint alleging a claim under section 2 of the Sherman Act premised on fraud must adhere not only to the

[11] Excluded from the proposed class are "Alkermes and its officers, directors, management, employees, subsidiaries, or affiliates, and all governmental entities." ECF 1, ¶¶ 133.

pleading standards set forth in *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), but also to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). *Novartis*, 902 F.3d at 9. The Court must "accept all well-pleaded allegations of plaintiffs as true and afford all inferences in the plaintiffs' favor." *Vázquez-Ramos v. Triple-S Salud, Inc.*, 55 F.4th 286, 291 (1st Cir. 2022) (brackets omitted). It "may also consider facts subject to judicial notice [and] implications from documents incorporated into the complaint." *Breiding v. Eversource Energy*, 939 F.3d 47, 49 (1st Cir. 2019) (quotation marks omitted). The "complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). In addition, under Rule 9(b), "the party alleging the fraud, with respect to elements not bearing on the 'conditions of a person's mind,' 'must state with particularity the circumstances constituting fraud.'" *Novartis*, 902 F.3d at 9 (quoting Fed. R. Civ. P. 9(b)).

**DISCUSSION**

Value Drug alleges that Alkermes violated section 2 of the Sherman Act by defrauding the USPTO to obtain the '499 patent, and by enforcing that patent through a "sham" lawsuit against Teva, as Alkermes would have known, based on the 2000 prior art, that the patent could not withstand an invalidity defense. Section 2 "makes it unlawful for any person to 'monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations.'" *Apple Inc. v. Pepper*, 587 U.S. 273, 279 (2019) (quoting 15 U.S.C. § 2). Alkermes moves to dismiss this claim based on the *Noerr-Pennington* doctrine. *See United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 669 (1965); *E. R. R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 136 (1961). Grounded in the First Amendment, that doctrine "provides a party immunity from antitrust liability

for petitioning the government for redress," including when "enforcing one's intellectual property rights in court." *Novartis*, 902 F.3d at 4-5.

Value Drug responds by invoking the *Walker Process* fraud exception to the *Noerr-Pennington* doctrine.[12] *See Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177-78 (1965). That exception prohibits *Noerr-Pennington* immunity where the antitrust defendant has obtained the challenged patent through fraud on the USPTO, as Value Drug has claimed Alkermes did here. *Novartis*, 902 F.3d at 5, 7-8. In the eponymous case, the Supreme Court held that "the enforcement of a patent procured by fraud on the Patent Office may be violative of [section] 2 of the Sherman Act." *Walker Process*, 382 U.S. at 174. To invoke this exception, Value Drug must allege that Alkermes made materially "false representations with intent to mislead or deceive the Patent Office, but for which the '[499] patent would not have issued." *Novartis*, 902 F.3d at 9 (citation modified). Alkermes disputes both elements: materiality and intent. The Court addresses those elements in turn.

## I. <u>Materiality.</u>

Materiality "'requires that the patent would not have issued *but for* the patent examiner's justifiable reliance on the patentee's misrepresentation or omission.'" *Id.* (quoting *Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1347 (Fed. Cir. 2007)). When materiality is premised on a failure to disclose, the plaintiff must allege "facts from which the court may reasonably infer that a specific individual . . . knew of invalidating information that was withheld from the [US]PTO." *Delano Farms Co. v. California Table Grape Comm'n*, 655 F.3d 1337, 1350 (Fed. Cir. 2011).

[12] The Court need not address the parties' arguments about the "sham" litigation exception because, as will be explained, Value Drug plausibly alleges a *Walker Process* fraud claim. *See Novartis*, 902 F.3d at 13 (discussing the "sham" exception's two-pronged test).

Value Drug plausibly alleges materiality. As pled, the USPTO expressly relied on Dr. Ehrich's "persuasive" 2009 declaration to conclude that there was "no prior art disclosing [Alkermes'] composition and effect, particularly an AUC about three times greater than that achieved by 50 mg/day oral administration," and to, in turn, issue the '499 patent. ECF 1, ¶¶ 79-80 (quotation marks omitted). Dr. Ehrich's declaration and Alkermes' initial 2005 patent application both characterized the injection formulation as having produced "unexpected" results. *Id.* ¶¶ 74-76 (quotation marks omitted). Yet neither document disclosed as prior art the 2000 study co-authored by Dr. Ehrich, which—like the '499 patent—used a "polylactide-coglycolide polymer," involved a dose of "about 310 mg," and yielded an AUC at least three times greater than that of a 50-mg oral dose of naltrexone. *Id.* ¶¶ 62, 66-69, 77. That study plausibly indicates, contrary to Alkermes' statements to the USPTO, that the claimed results of the '499 patent were expected, not unexpected. Accepting Value Drug's allegations as true, the failure to disclose the 2000 study to the USPTO as prior art in Alkermes' patent application and Dr. Ehrich's declaration, together with their descriptions of the scientific basis for the '499 patent as "unexpected," were material. *See Apotex Inc. v. UCB, Inc.*, 763 F.3d 1354, 1361 (Fed. Cir. 2014) (finding materiality where USPTO allowed a patent after defendant's founder "made affirmative misrepresentations" and "omit[ted] important details" about prior art that was "known to him"); *Pharmacia Corp. v. Par Pharm., Inc.*, 417 F.3d 1369, 1373 (Fed. Cir. 2005) (same where defendant submitted "misleading declarations" to the USPTO that "never disclosed" a "conflicting article co-authored by the declarant himself" that went "to the very point of novelty").

Alkermes protests that Value Drug's theory of materiality is implausible for two reasons. First, Alkermes points to the fact that the USPTO affirmed the '499 patent on reexamination after receiving transcripts of Dr. Ehrich's trial testimony in the Teva litigation, including portions

discussing the 2000 study. But it is undisputed that Alkermes did not submit the 2000 study—the key prior art—to the USPTO in connection with that reexamination. And Alkermes has no convincing answer to Value Drug's argument that an examiner could reject patent claims only based on "prior art patents and printed publications." *In re NTP, Inc.*, 654 F.3d 1268, 1276 (Fed. Cir. 2011); *see* USPTO, Manual of Patent Examining Procedure § 2258(I) (9th ed. Nov. 2024) ("Rejections on prior art in reexamination proceedings ordered under 35 U.S.C. 304 may only be made on the basis of prior art patents or printed publications."). The fact that the examiner reaffirmed the '499 patent in the absence of the prior art at issue here does not, accordingly, undermine Value Drug's plausible showing of materiality. And even if, assuming favorably to Alkermes, the examiner could have invalidated the '499 patent based only on the transcripts of Dr. Ehrich's trial testimony, the "fact that the examiner did not rely on [the transcripts] to reject the claims under reexamination . . . is not conclusive concerning whether [they were] material." *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1180 (Fed. Cir. 1995). That is especially so here, because Alkermes did not draw attention to Dr. Ehrich's testimony about the 2000 study during the reexamination proceedings. *See eSpeed, Inc. v. BrokerTec USA, L.L.C.*, 480 F.3d 1129, 1136-37 (Fed. Cir. 2007) (finding materiality where patentee "provided the examiner with 1139 pages of material" in an "attempt to cure the earlier non-disclosure of" prior art without placing the examiner "on notice" of such art). Its brief before the USPTO referenced the trial testimony but did not discuss the 2000 study at all. *See* ECF 77, at 7 (citing ECF 78, at 3-4 & n.3).

These facts distinguish this action from *Novartis*, upon which Alkermes relies. In that case, the First Circuit affirmed dismissal of a *Walker Process* fraud claim where the plaintiffs failed to plausibly allege that the defendant's misrepresentation to the USPTO—that the prior art did not disclose a certain salt of a compound—was material to the issuance of the disputed patent.

*Novartis*, 902 F.3d at 8-9. That was so, the First Circuit reasoned, because the defendant "submitted this prior art to the Patent Office"—albeit after "the patent examiner had already issued the notice of allowance for" the patent—and the examiner then "initialed and signed" a form indicating that he or she had subsequently considered such art. *Id.* at 9; *see* 37 C.F.R. § 1.311(a) ("notice of allowance" to be issued if "it appears that the applicant is entitled to a patent"). Here, in contrast, Alkermes never disclosed the 2000 study to the USPTO during the original patent prosecution or more recent reexamination. *See Molins*, 48 F.3d at 1182 (prior art references provided "eventually" to the USPTO and "initialed" by patent examiner at reexamination "were not cited when they should have been"). It is also reasonable to infer at this stage, especially where the complaint lacks any allegations about reexamination, that Alkermes' submission of the trial transcripts was insufficient to place the patent examiner on notice about that study. *See In re Lipitor Antitrust Litig.*, 868 F.3d 231, 270 (3d Cir. 2017) (reversing dismissal of *Walker Process* fraud claim because "a fact finder [could] conclude that inequitable conduct or fraud occurred in the patent's prosecution despite the patent's reissuance" where "no allegations suggest[ed] that the [US]PTO's reissuance made an express determination regarding [defendant's] lack of fraud during the original patent proceeding").

Second, pointing to Teva's settlement, Alkermes contends that it makes no sense for Teva to have settled and delayed entering the market for over three years when it had FDA approval if, as alleged, the trial evidence exposed fraud and "spelled certain doom for the '499 patent." ECF 1, ¶¶ 113-15. In Alkermes' view, the Court should therefore find it implausible that fraud infected Alkermes' submissions to the USPTO. This argument claims too much on a motion to dismiss, where the Court must draw all inferences in favor of the plaintiff. Teva may have decided to settle for any number of reasons, including "the uncertainties" and "cost of litigating" after trial through

the appeals process, notwithstanding the strength of its litigation position. *Fed. Trade Comm'n v. AbbVie Inc.*, 976 F.3d 327, 368 (3d Cir. 2020). Accordingly, Value Drug has sufficiently alleged materiality.[13]

## II. Intent.

In addition to materiality, Value Drug must allege that Alkermes acted "with the requisite intent to deceive the Patent Office." *Novartis*, 902 F.3d at 9. This requires making plausible allegations that, as relevant here, "at least one specified individual acted with the specific intent to deceive the [US]PTO by withholding material information." *Glob. Tubing LLC v. Tenaris Coiled Tubes LLC*, 167 F.4th 1357, 1370 (Fed. Cir. 2026) (quotation marks omitted); *accord Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1328-29 (Fed. Cir. 2009). The operative inquiry is into Alkermes' "intent during the prosecution of the original application," not its intent during reexamination. *Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.*, 326 F.3d 1226, 1241 (Fed. Cir. 2003).

Value Drug plausibly alleges fraudulent intent. According to the complaint, Dr. Ehrich "co-authored" the 2000 study, "knew" of its publication before the 2005 patent application, and attested in a 2009 declaration that Vivitrol's later results were "unexpected," despite the 2000 study's disclosure of nearly identical dosing and AUC values. ECF 1, ¶¶ 62-65, 74-77 (quotation marks omitted). Alkermes was likewise aware of the 2000 study and the actions of its employee, Dr. Ehrich. *Id.* ¶¶ 55, 62-65, 74. Taken together, these allegations support the plausible inference that

---

[13] Value Drug separately argues that Alkermes' actions "amounted to the type of 'egregious misconduct' that, like 'the filing of an unmistakably false affidavit,' makes the inclusion of such representations per se material to a patent's issuance." *Novartis*, 902 F.3d at 12 (quoting *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1292 (Fed. Cir. 2011) (en banc)). The Court does not reach this *per se* materiality argument because it concludes that Value Drug has plausibly alleged materiality based on but-for causation.

Alkermes and Dr. Ehrich withheld invalidating prior art with the specific intent to deceive the USPTO. *See Delano Farms*, 655 F.3d at 1350 (intent met where a "reasonable jury could infer that Dr. Ramming knew of the prior use, appreciated that the prior use was material, and decided not to disclose that information to the [US]PTO"); *Luv n' Care, Ltd. v. Laurain*, 98 F.4th 1081, 1099 (Fed. Cir. 2024) (observing that "purposeful omission or misrepresentation of key teachings of prior art references may . . . be indicative of a specific intent to deceive the [US]PTO" and collecting cases holding the same).

Alkermes disagrees, arguing that a "mere failure to cite a reference to the [US]PTO will not suffice." *Dippin' Dots*, 476 F.3d at 1347 (quotation marks omitted). But "evidence may establish that a patent applicant knew one fact and presented another, thus allowing the factfinder to conclude that the applicant intended by the misrepresentation to deceive the examiner." *Id.* That is exactly what Value Drug alleges here. Alkermes and Dr. Ehrich allegedly knew that a study he co-authored in 2000 yielded similar results to the claimed invention yet failed to disclose it in the 2005 patent application or his 2009 declaration. *See Pharmacia*, 417 F.3d at 1373 (intent satisfied given "the highly material nature of th[e] misleading statements and the failure to submit a directly conflicting article co-authored by the declarant himself"). Such factual allegations support a "reasonable inference" of fraudulent intent by Alkermes, whose employee "owed a duty of disclosure in prosecuting the '[499] patent" and allegedly "knew of the specific information . . . material to the claims of [that] patent." *Exergen*, 575 F.3d at 1330, 1329 n.5 (citing *Greenstone v. Cambex Corp.*, 975 F.2d 22, 26 (1st Cir. 1992)); *cf. InMode Ltd. v. BTL Indus., Inc.*, No. 24-cv-12955-PBS, 2026 WL 961841, at *1 (D. Mass. Apr. 9, 2026) (denying dismissal of inequitable conduct counterclaim and defense where complaint permitted "the reasonable inference that a 'specific individual' . . . knew of the 'specific information' in the [disputed] patent . . . yet withheld

that information from the [US]PTO" (quoting *id.* at 1330)). Having adequately alleged materiality and intent, Value Drug states a *Walker Process* claim and thus a plausible violation of section 2 of the Sherman Act.

**III. <u>Statute of Limitations.</u>**

Alkermes separately seeks dismissal of any claim for damages outside of the four-year statute of limitations. A "cause of action under" the Sherman Act is "forever barred unless commenced within four years after the cause of action accrued." 15 U.S.C. § 15b. In general, "'a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business.'" *Rotella v. Wood*, 528 U.S. 549, 558 (2000) (quoting *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971)). The Sherman Act is "subject to [equitable] tolling," however, which permits courts "to extend [the] limitations period when circumstances warrant." *United States v. Wong*, 575 U.S. 402, 414 (2015) (citing *Am. Pipe & Const. Co. v. Utah*, 414 U.S. 538, 559 (1974)). Such tolling is appropriate here, Value Drug argues, based on the doctrine of fraudulent concealment. To invoke that doctrine, Value Drug must plausibly allege "three elements: 1) wrongful concealment by [Alkermes] of [its] actions; and 2) failure of [Value Drug] to discover, within the limitations period, the operative facts which form the basis of the cause of action; 3) despite [Value Drug's] diligent efforts to discover the facts." *Álvarez-Maurás v. Banco Popular of Puerto Rico*, 919 F.3d 617, 626 (1st Cir. 2019). Alkermes contests the first and third elements.

With respect to the first element, the complaint alleges that Alkermes "intentionally concealed from [Value Drug] the existence of this cause of action" by mispresenting its drug's results as unexpected without disclosing the 2000 study. ECF 1, ¶ 165. Alkermes contends that its alleged "[m]ere silence" is insufficient because fraudulent concealment requires "affirmative acts

or representations which are calculated to, and in fact do, prevent the discovery of the cause of action." *Gonzalez-Bernal v. United States*, 907 F.2d 246, 250 (1st Cir. 1990) (quotation marks omitted). Value Drug responds that it has pled "affirmative conduct by [Alkermes] intended to conceal the facts upon which [it] based [its] complaint or to deceive [it] into believing that [it] did not have a cause of action." *Berkson v. Del Monte Corp.*, 743 F.2d 53, 56 (1st Cir. 1984).

The Court need not resolve the first element because, even assuming that Alkermes' omission of the 2000 study from the 2005 patent application and Dr. Ehrich's 2009 declaration constitutes affirmative misconduct, Value Drug has failed to plausibly allege the third element. Value Drug asserts that it "could not have known about this cause of action until on or after February 2023 when evidence, obtained through confidential discovery, was presented publicly at the Teva trial," which revealed that the disputed study was presented in December 2000. ECF 1, ¶ 165. But this assertion is belied by other allegations in the complaint that the 2000 study has been "published" and "publicly available" since 2001 and was cited in a 2004 article. *Id.* ¶¶ 71-72, 82, 113. Taking those factual allegations as true, Value Drug did not have to wait for the Teva litigation in 2023 to discover the 2000 study and bring this Sherman Act claim. Rather, it could have conducted its own research into Dr. Ehrich—who is the '499 patent's sole inventor and a co-author of both the 2000 study and the 2004 article—and discovered the published 2000 study. *Id.* ¶¶ 55, 62-63, 72; *see Callahan v. United States*, 426 F.3d 444, 455 (1st Cir. 2005) (fraudulent concealment insufficiently alleged where the relevant information was "easily discoverable" and plaintiff "was not diligent in seeking to obtain it").

Value Drug cannot cure this pleading deficiency through the additional allegation that its "ignorance up until these February 2023 disclosures was not attributable to lack of diligence on its part." ECF 1, ¶ 165. That is so because "a plea of ignorance" is insufficient to claim fraudulent

concealment and toll the statute of limitations. *Berkson*, 743 F.2d at 56 (quotation marks omitted). Value Drug also argues that it had no reason to discover its injury sooner. Alkermes' lawsuit against Teva in 2020, however, should have placed Value Drug on notice that the '499 patent may be invalid. *See Kennedy v. Josephthal & Co.*, 814 F.2d 798, 802 (1st Cir. 1987) (inquiry notice "is triggered by evidence of the possibility of fraud" and thus does not require that "the nature and extent of the fraud" be "fully discovered"); *Edmonson v. Eagle Nat'l Bank*, 922 F.3d 535, 555 (4th Cir. 2019) ("similar lawsuits against the same defendant may . . . suffice to give notice of possible claims" (quotation marks omitted)). Value Drug therefore had a duty to diligently investigate the '499 patent since at least 2020, but it failed to exercise such diligence. Because a simple search would have revealed the publicly available 2000 study, Value Drug cannot invoke the doctrine of fraudulent concealment to toll the statute of limitations. *See Zirvi v. Flatley*, 838 F. App'x 582, 587 (2d Cir. 2020) (no fraudulent concealment given "the public information available to plaintiffs" through litigation before the USPTO and in federal court regarding misappropriation of trade secrets); *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211, 218 (4th Cir. 1987) (same where plaintiffs could have uncovered defendant's antitrust violations through "simple inquiry and consultation of public records"). Accordingly, Value Drug may not recover for any purchases of Vivitrol that it made prior to October 2, 2021, four years before the filing of this lawsuit.

**CONCLUSION AND ORDER**

For the foregoing reasons, Alkermes' motion to dismiss, ECF 65, is GRANTED in part and DENIED in part. Count I will not be dismissed, but Value Drug cannot recover damages for purchases of Vivitrol that it made before October 2, 2021.

SO ORDERED.

/s/ Julia E. Kobick
JULIA E. KOBICK
UNITED STATES DISTRICT JUDGE

Dated: September 24, 2026